# United States Court of Appeals
## For the First Circuit

No. 00-2546

RAMÓN ZAPATA-MATOS,

Plaintiff, Appellant,

v.

RECKITT & COLMAN, INC., f/k/a L&F PRODUCTS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Kravitch,* Senior Circuit Judge,
and Lynch, Circuit Judge.

Jane Becker Whitaker for appellant.
Graciela J. Belaval with whom Martinez Odell & Calabria was
on brief for appellee.

---

* Of the Eleventh Circuit, sitting by designation.

**LYNCH, Circuit Judge**. Ramón Zapata-Matos was terminated in 1993 from his position with L&F Products as General Manager for all operations in Puerto Rico, Mexico, and the Caribbean. He had been with the company since 1983 and had received a number of promotions, although in 1992 the company declined to create and promote him to a Regional Director's position as he had requested. Zapata's employment was terminated on September 28, 1993. He sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (1994), saying he had been discriminated against on the basis of his national origin as a Puerto Rican.

In a thoughtful opinion and order, the magistrate judge granted summary judgment for defendant L&F.[1] The court concluded that Zapata had "presented insufficient evidence from which a rational fact finder could conclude that in failing to promote, and subsequently terminating Zapata, L&F Products discriminated

---

[1]    L&F is now known as Reckitt & Colman, Inc.

against him on the basis of his Puerto Rican heritage."  We agree, and affirm.  In so doing we clarify what is meant by evidence of pretext and the ultimate issue of discrimination.

I.

We review the grant of summary judgment de novo and draw all reasonable inferences from the facts in plaintiff's favor.  Lennon v. Rubin, 166 F.3d 6, 8 (1st Cir. 1999).

The undisputed facts tell the story.  Zapata was hired in 1983, as a Manager for Givenchy Products, a division of Sterling Products, Inc.,  itself a subsidiary of Eastman Kodak Corporation.  He was hired by a Sterling vice president with the approval of Michael Gallagher, the company's President.

In 1989, Zapata was promoted to the position of General Manager of L&F Products, Caribbean, also an Eastman Kodak subsidiary.  Gallagher, again, was involved in his appointment. In addition, with Gallagher's blessing, Zapata's responsibilities were increased to include Mexico as well as Puerto Rico and the Carribean.  In recognition of his greater responsibilities, Zapata received a salary increase, again with Gallagher's approval. Indeed, in 1992, Zapata's immediate

supervisor stated that he anticipated promoting Zapata to Regional Director in a year.[2]

In 1992, in light of his new responsibilities, Zapata actively sought to be named Regional Director for L&F for Mexico and the Caribbean. Gallagher told Zapata that he was not going to create a Regional Director position for Zapata's region. Nonetheless, Zapata continued to receive very positive performance evaluations, and Gallagher rated his work as "very good."

But a serpent lurked in this happy scene. The prices charged by L&F for its goods in Puerto Rico were as much as 30% lower than for the same goods on the U.S. mainland. This led potential mainland buyers to buy from third party middlemen, who bought low in Puerto Rico and resold stateside. The resale prices were still lower than mainland prices. The company was very concerned about this "diversion problem" and Zapata was ordered at a meeting in Montvale, New Jersey early in 1992, and later by memo dated July 8, 1992, to make Puerto Rico prices

---

[2] He had earlier recommended that the company send Zapata to a management development program at a business school like Wharton or Harvard.

equal to mainland U.S. prices. He balked and predicted this strategy would cause the Caribbean Division to lose at least $2.4 million in operating profits. He asked for time to present an alternative plan. Zapata's direct supervisor, A.J. Brown, responded in a July 8, 1992 memo that while he was willing to listen to alternatives, he would not change his position on price parity. Brown told Zapata it was unfortunate he had to "order" Zapata to do this, that Zapata had known of the urgency of the problem for nine months, and that he should have come up with a plan earlier. Gallagher was copied on the correspondence.

In an August 1992 budget meeting, Zapata tried to get the price parity directive reconsidered and expressed his fear about the negative effect it would have on the Puerto Rican market. According to Zapata, Gallagher responded "Fuck Puerto Rico . . . . We've got to change and we've got to fix this situation, because we don't want this happening." Zapata says this remark showed discrimination against Puerto Ricans. It is the only such remark alleged.

True to form, the company repeated its policy against diversion in a memorandum dated November 13, 1992. As Zapata

predicted, the raising of prices in Puerto Rico and the Caribbean substantially hurt his Division's sales. Zapata says sales in Puerto Rico dropped by about 40%. He also says that when he did the budget review in 1992 he was told by Gallagher not to worry about the profit decline because they had the Mexican market. Zapata felt he should "get Mexico growing." Then, he says, by mid-year 1993 the emphasis was switched back to Puerto Rico, and he was put under severe pressure to increase profits. A goal of $500,000 in profits for the Division was set.

Zapata, in response, worked on what he called a "reengineering plan" to downsize and eliminate the positions of some key employees. Zapata says he was initially told not to prepare a budget for 1993, but as the annual budget meeting for the upcoming 1993 year -- to be held in Puerto Rico on September 26-28 -- approached, Zapata was reminded of needed financial information by a September 20 memo from Peter Black, the Group Vice President for North America. Zapata immediately met with his key staff. On the same day, after the meeting, four of the key staff members resigned: the managers for Marketing, Sales, and Products. The four sent letters to the company.

The magistrate judge's opinion and order capture the essence of the letters. Gloria Castillo, a Marketing Manager, wrote that she could not "continue to work under the conditions now prevailing at L&F Products, where decisions are taken impulsively and the course of action is changed from day to day." Edgardo De La Torre, a Sales Manager, wrote that he was resigning due to "a series of irreconcilable differences with the top management of L&F Products Caribbean." Yvette De Jesús, a Product Manager, expressed her belief that "some of the actions taken by the company could hamper [her] future professional growth in this market." Sylvia Rivera, also a Product Manager, stated that she was resigning due to "[t]he atmosphere of instability and uncertainty that has prevailed in L&F during the last few weeks."

After receiving these letters, Zapata spoke with the four employees. Each expressed different reasons for leaving the company, but none of the reasons stated to Zapata concerned his own management style. Several of the employees indicated that they were leaving the company due to the company's new pricing policy, which had resulted in monetary losses to the Puerto Rico operation. In light of these four resignations,

the review scheduled for September 26, 1993, did not take place. The four resignations eliminated the top level of management under Zapata in the Division. Zapata had planned to eliminate two of the positions as part of his reengineering plan, but not all four.

Caught by surprise by the four employees' resignation letters, L&F sent its Vice President of Human Resources, Gary Pearl, and Peter Black to Puerto Rico. Pearl and Black interviewed those four employees and others. Black told Zapata that the four employees were "renegades." Black also said they had a "tough situation." Black did not, however, say what the four employees had told him. After the interviews, Pearl and Black recommended to Gallagher that Zapata be terminated immediately. Pearl stated that he was told by the four employees that Zapata's management style was deficient and did not foster an effective work atmosphere. Even more seriously, Pearl stated that he was told Zapata "implemented plans contrary to stated marketing and sales philosophies and strategies of the parent company."

Gallagher agreed to terminate Zapata. Gallagher, who had approved the hiring and promotion of Zapata in earlier

years, and who thought Zapata's performance had been very good, said at deposition:

> The organization in Puerto Rico had resigned in a major and surprising move with a letter to Ramon that was faxed up to our offices from several of the senior managers, which indicated that they, the organization, had lost confidence in Ramon as their leader and didn't want to work for the company any more.
> Obviously, this was a major concern to us, a surprise, and as I recall, Peter Black and Gary Pearl, who was vice president of HR, called down there, talked to some people and they went down there immediately, and in discussions with the people found out that the management style of Mr. Zapata was abusive, disrespectful, to the point that these people were very unhappy and decided to leave, and from what we could tell, the organization had lost confidence in Ramon; he was not managing the way we wanted our managers to manage.

Zapata was told the news on September 28, 1993. He says he was given no reason for his termination. He was given a severance package which included payment of his full regular salary for six months. A September 27, 1993 letter addressed to Black, and signed by more than twenty L&F employees, expressed support for and solidarity with Zapata.

Faced with vacancies in the top management, L&F moved a long-term manager within the corporate family, Kevin Dunn, in to oversee the Caribbean and Mexican operations within a few

months of Zapata's termination. Dunn had been Vice President of Marketing of consumer products for L&F, and he took the position of Regional Director for the Caribbean, Puerto Rico and Mexico with L&F. The Puerto Rican and Mexican markets were later separated and a Puerto Rican, Alberto Fernández Comas, was named General Manager of the Puerto Rican market. Within a year, L&F Products itself was sold.

## II.

Before the district court, this case was governed by the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

Under the McDonnell Douglas framework, once the plaintiff has met the low standard of showing prima facie discrimination, the employer must articulate a legitimate nondiscriminatory reason in response. Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). Once that reason is articulated, the presumption of discrimination drops out of the picture, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993), the McDonnell Douglas framework with its presumptions and burdens disappears, and the sole remaining

-10-

issue is of discrimination vel non. <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000); <u>Melendez-Arroyo</u> v. <u>Cutler-Hammer De P.R. Co., Inc.</u>, 273 F.3d 30, 33 (1st Cir. 2001).

The <u>McDonnell Douglas</u> framework having dropped out of the case, "the ultimate burden is on [Zapata] to persuade the trier of fact that [he was] treated differently because of [his national origin]." <u>Thomas</u> v. <u>Eastman Kodak Co.</u>, 183 F.3d 38, 56 (1st Cir. 1999). On summary judgment, the question is whether plaintiff has produced sufficient evidence that he was discriminated against due to his national origin to raise a genuine issue of material fact. <u>Melendez-Arroyo</u>, 273 F.3d at 33; <u>Dominguez-Cruz</u> v. <u>Suttle Caribe, Inc.</u>, 202 F.3d 424, 430-31 (1st Cir. 2000).

<u>Reeves</u> reinforced the prior law in this circuit that even if the trier of fact disbelieves the nondiscriminatory explanation given by the employer, the trier is not compelled to find that the real reason was discrimination. 530 U.S. at 147; <u>Thomas</u>, 183 F.3d at 57. That is because the ultimate question is not whether the explanation was false, but whether discrimination was the cause of the termination. We have

-11-

adhered to a case by case weighing.  <u>Thomas</u>, 183 F.3d at 58.  Nonetheless, disbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer had discriminated.  <u>Reeves</u>, 530 U.S. at 146-47; <u>Thomas</u>, 183 F.3d at 57 ("[E]vidence showing that the employer's articulated reason is false" can be sufficient to overcome the third stage in the <u>McDonnell Douglas</u> framework, but "there can be no mechanical formula . . . . everything depends on the individual facts.").  Ultimately, the question is one of the sufficiency of plaintiff's evidence.  <u>Id.</u> at 61.  As the Supreme Court said in <u>Reeves</u>:

> [A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

530 U.S. at 148.  The facts of each case are important.  <u>Thomas</u>, 183 F.3d at 57.

We dispose of a preliminary matter where Zapata argues that the magistrate judge used an erroneous standard.  Zapata argues that the magistrate judge incorrectly relied on <u>Mesnick</u> v. <u>Gen. Elec. Co</u>, 950 F.2d 816 (1st Cir. 1991), in analyzing the question of pretext

by focusing on the employer's belief about the truth of its stated reason.  In part, Mesnick states that in analyzing whether an "employer's proffered reason is actually a pretext for discrimination . . . . a court's 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." 950 F.2d at 823-24 (quoting Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)) (emphasis omitted).

We agree that the employer might believe its stated reason for its action and honestly believe that the reason was nondiscriminatory, while the jury might find that the same reason was honestly held but conclude that it constituted discrimination (e.g., stereotyping).  To that extent, the employer's good faith belief is not automatically conclusive; but this refinement on Mesnick is likely to be rare and is in any event irrelevant here.  Conversely, there may be pretextual explanations -- ones not honestly believed by the decisionmaker -- which do not lead to liability because the actual unadmitted reason still does not constitute discrimination.

With that clarification, we turn to the analysis of the facts.  Zapata's theory of discrimination was that this was a glass-ceiling case: that at L&F a Puerto Rican could hold the

title of General Manager but not the title of Regional Director. The implications of the theory are that the company officials engineered, or took advantage of, a situation where they could terminate Zapata's employment rather than promote him to Regional Director. The proof, Zapata says, is that Dunn, an Anglo, was named Regional Director, and he, Zapata, a Puerto Rican, was not.

Plaintiff's case resolves to three themes from the evidence that he says permit the ultimate inference of discrimination: one comment by Gallagher, the company president; the fact that some months after Zapata's termination a non-Puerto Rican assumed his duties, and held the Regional Director title that Zapata had sought; and the fact that the company's stated reasons for his termination could be found to be untrue. When these themes are moved from the abstract to the particulars of the case, they prove to be unimpressive.

The Comment About Puerto Rico

Gallagher's comment is best analyzed in context. Zapata sold L&F products in Puerto Rico at prices up to 30% lower than prices charged to retail outlets in the mainland of the United States. This led potential U.S. buyers to buy from

-14-

secondary sellers in Puerto Rico (such as K-Mart), still at lower prices than U.S. prices, thus diverting profits to third parties. Concerned about the losses to its United States markets, the company, on July 8, 1992, directly ordered Zapata to raise prices to the same level as in the continental United States. Zapata resisted but was again ordered to have the new prices in place by September 1, 1992. Nonetheless, later in August, Zapata again tried to get the company President, Michael Gallagher, to change course because his sales in Puerto Rico would decline if prices rose. An obviously frustrated Gallagher responded "Fuck Puerto Rico . . . . We've got to change and we've got to fix this situation, because we don't want this happening." The comment was clearly directed to Zapata's view that the company's concerns about mainland market losses should be subordinate to Zapata's concern about his division. No rational fact finder could, in this context, conclude that this comment expressed discrimination against the company's Puerto Rican employees.

The Replacement

When the four top employees resigned and the company fired Zapata, it was left without management for its Puerto

-15-

Rican operations.  In early 1994, a long-term company employee, Kevin Dunn, was named Regional Director of L&F Products for the Caribbean and Mexico. Dunn thus took over Zapata's responsibilities, and received the title that Zapata wanted.

Dunn, however, was already a Vice President at L&F, a position higher in rank than the one of Regional Director, when the company looked to him to fill the void at L&F.  Under these circumstances, we think no rational inference of discrimination against Puerto Ricans can be drawn from Dunn's assumption of these responsibilities as Regional Director.  Further, when a new permanent manager was named to cover the Puerto Rican market, it was Alberto Fernández Comas, a Puerto Rican who was hired from outside the company.

## The Stated Reason as Pretext

An assertion of pretext requires an examination of the employer's articulated reason for termination.  Where and when that reason is articulated has significance.  In Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424 (1st Cir. 2000), this court found sufficient evidence of pretext to survive summary judgment where the reasons given at termination and in contemporaneous documents appeared to be inconsistent with the defendant's

answer to the complaint and with deposition testimony. Further, the depositions themselves appeared to be inconsistent. All of this was buttressed by extrinsic evidence that undercut the proffered reason. Id. at 431-32.

In this case, by contrast, no reasons were given at termination and no contemporaneous documents stating a reason at the time of termination have been introduced. No reasons are given in the answer to the complaint, save for a pleading that plaintiff was terminated for just cause. We thus turn to the explanations that the managers involved gave at their depositions for terminating Zapata. Those explanations, described above, are themselves consistent and not contradicted by either contemporaneous documents or statements made at termination, or statements made later. Further, the explanations are quite credible in light of the preceding events.

Zapata argues that the four L&F employees who resigned right before his termination did not make negative comments about his management style to the decisionmakers, because neither the four employees nor the management voiced these complaints to him. That is not a serious argument. It is human

-17-

nature for a person not to tell someone to his face about complaints he has just made about him. And management did not give him any reasons, he says.

More serious is the argument that nothing in the prior work history suggests that Zapata was a poor manager. A trier of fact could reasonably think that this raises questions about the sudden emergence, albeit in a time of extreme pressure, of a managerial style problem on Zapata's part. On the other hand, a trier of fact could much more readily conclude that the employer's explanation was not a pretext, was quite true,[3] and was reinforced by two facts: four top employees had just resigned rather than work with Zapata in a difficult period, and the company well knew Zapata had been balking at the directives from the parent company.

The question on summary judgment is whether the slight suggestion of pretext present here, absent other evidence from which discrimination can be inferred, meets plaintiff's ultimate burden. We hold it cannot. This case fits into the category

---

[3] Zapata also did not, by deposition testimony or affidavits from the four former employees, refute the management's assertions about the employees' reasons for resignation.

<u>Reeves</u> described of plaintiff creating (at best) a weak issue of fact as to pretext on the face of strong independent evidence that no discrimination occurred. 530 U.S. at 148. Considering, as <u>Reeves</u>, 530 U.S. at 158, mandates, the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and other evidence supporting the employer's case, the employer is entitled to judgment as a matter of law.

<u>Affirmed.</u>