**Georgine IRELAN, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner, Social Security Administration, Defendant.**

**No. CIV.A.02–1192.**

United States District Court, E.D. Pennsylvania.

Jan. 29, 2003.

---

Judith A. Dexter, Bethlehem, PA, for Georgine Irelan.

Nicolas Cerulli, Social Security Admin., Office of General Counsel, Philadelphia, PA, William B. Reeser, Soc. Sec. Admin., Office of General Counsel, Region III, Philadelphia, PA, Patricia McCracken, U.S. Atty., Sp. Asst., Philadelphia, PA, for Jo Anne B. Barnhart.

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

This is an appeal from a final decision of the Commissioner of the Social Security Administration denying plaintiff Georgine Irelan's claim for supplemental security income (SSI) and disability insurance benefits (DIB). Before the court are plaintiff's motion for summary judgment seeking that the court reverse the Commissioner's denial of benefits on the merits, defendant's cross-motion for summary judgment, and plaintiff's reply to defendant's motion for summary judgment. Also before the court are a Report and Recommendation of the Magistrate Judge recommending that the court grant the defendant's motion and deny the plaintiff's motion, and plaintiff's exceptions to that Report and Recommendation.

Plaintiff has raised a plethora of objections to the Magistrate Judge's Report and Recommendation. In particular, she alleges that the Magistrate Judge erred in concluding that the ALJ's decision was not supported by substantial evidence on the record because: (1) the ALJ failed to give proper weight to the opinions of plaintiff's treating physician, Dr. Ruth Frye, (2) the 1994 opinion of Dr. Clifford Vernick, on which the ALJ relied, was issued seven years before the ALJ made his decision on Irelan's eligibility for SSI and DIB benefits, (3) the ALJ, along with the Magistrate Judge, misinterpreted Dr. Vernick's 1992 and 1994 evaluations as suggesting that plaintiff could return to full-time, sedentary work, (4) the Magistrate Judge determined that Irelan was magnifying her symptoms based only on a single comment by a one-time examiner, (5) the vocational expert's testimony at plaintiff's hearing did not support the idea that plaintiff could return to work and was not supported by proper references to the Dictionary of Oc-

cupational Titles, (6) that plaintiff's meager social life and part-time status as a student do not suggest that her claims of pain are unsubstantiated, and (7) that the Magistrate Judge failed to find adequate support for the ALJ's determination that plaintiff was not credible regarding her complaints of pain.

For the reasons that follow, the court will adopt the Report and Recommendation of the Magistrate Judge, and will grant defendant's motion for summary judgment. The court finds, contrary to plaintiff's assertion, that there is substantial evidence to support the Commissioner's denial of supplemental security income and disability insurance benefits.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Georgine Irelan is a 56 year-old female high school graduate who has completed some college courses toward a degree in Business Administration. Record at 62, 93, 148. Her past relevant work includes six years as a data entry supervisor, overseeing ten workers. Record at 41–42, 156. Prior to becoming a supervisor, Irelan worked as a keypunch operator. Record at 41, 156.

Irelan sought disability benefits in 1998 [1] in connection with herniated and protruding discs in her cervical spine, nerve entrapment, bone spurs, tendinitis affecting both arms, rotational problems with her shoulders, degenerative disc disease of the spine, spastic stomach and bowel problems, diverticulosis, and disruptive bowels. Record at 361. After her application was denied initially and on appeal, Record at 22, Irelan sought and received a de novo

hearing before an ALJ, Record at 33, who also denied Irelan's claim. Record at 19. The Appeals Council subsequently denied Irelan's request for review, Record at 13, and the Commissioner adopted the Appeals Council's decision, making the ALJ's determination the final decision of the Commissioner. Irelan then filed the instant action in federal court.

## II. DISCUSSION

### A. "Substantial Evidence" Standard

The role of the court is to determine whether the Commissioner's findings of fact are supported by "substantial evidence." 42 U.S.C. § 405(g); *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir.1995) (citing *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988)). Substantial evidence is defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Jesurum*, 48 F.3d at 117 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "It is less than a preponderance of the evidence, but more than a mere scintilla." *Id.* (citing *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420).

The search for substantial evidence "is not merely a quantitative exercise." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Rather the "administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981), *reh'g denied*, 650 F.2d 481 (3d Cir.1981). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails

---

1. Irelan first sought SSI in 1996 in connection with herniated discs in her cervical spine accompanied by nerve entrapment and bone spurs, and tendinitis in both arms that had allegedly rendered her disabled since January 3, 1992. Record at 118, 144. After her application was denied initially and upon reconsideration, Record at 95, 101, Irelan requested a de novo reconsideration hearing before an ALJ, who dismissed the action when Irelan failed to appear. Record at 322–23. Irelan did not appeal.

to resolve, a conflict created by countervailing evidence." *Kent,* 710 F.2d at 114.

The court's review of the Magistrate Judge's Report and Recommendation is de novo. 28 U.S.C. § 636(b). Therefore, the court "may accept, reject or modify, in whole or in part," the Magistrate Judge's findings and recommendations. *Id.* In considering claimant's objection to the Magistrate Judge's ruling, the court has independently reviewed the entire record, including the Report and Recommendation, the ALJ's written decision, the transcript of the hearing, the hearing exhibits, and relevant medical documentation.

### B. Establishing Eligibility for SSI

In order to qualify for SSI, a claimant must show that he suffers from a disability. The Social Security Act defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ... [The impairment must be so severe that the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

The Commissioner has established a five-step inquiry for determining whether a claimant is eligible for disability benefits under the Act. To prevail, a claimant must establish (1) that he is not engaged in substantial gainful activity, and (2) that he suffers from a severe medical impairment. *See Jesurum,* 48 F.3d at 117 (citing *Bowen v. Yuckert,* 482 U.S. 137, 140–41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). If the claimant shows these two elements, the Commissioner determines (3) whether the impairment is listed by the Secretary as one creating a presumption of disability. *Id.* If the claimant's medical impairment is not "listed," the claimant bears the burden of proving that (4) the impairment nonetheless prevents him from performing the work that he has performed in the past. *Id.* The relevant inquiry is "whether the claimant retains the residual functional capacity to perform [his] past relevant work," *Fargnoli v. Massanari,* 247 F.3d 34, 39 (3d Cir.2001). If the claimant satisfies this burden, the Secretary must grant him benefits unless the Secretary can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Jesurum,* 48 F.3d at 117 (citing *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985)).

### C. Irelan's Medical and Vocational History

#### 1. *The ALJ's decision*

In this case, the ALJ concluded that Irelan's "ability to engage in work-related activities is impaired secondary to severe impairments consisting of cervical disc disease with neck, shoulder, trapezius and bilateral arm pain; status post five dilatations and curettages; irritable bowel syndrome; and dysfunctional vaginal bleeding." Record at 27. Evaluating the medical record in this case, the ALJ concluded that Irelan retained the residual functional capacity to perform light and sedentary work, subject to exertional limitations:

> (1) claimant is restricted from lifting or carrying objects weighing in excess of 10 pounds, but can occasionally carry weights weighing up to ten pounds; (2) claimant is restricted from overhead work activity with both her upper extremities; (3) claimant is restricted from vibrating tools and machinery; (4)

claimant can occasionally use her arms for work activity but she cannot frequently use her arms for work activity; (5) claimant is restricted from jobs where frequent driving is required by the job; and (6) claimant is restricted from cold and damp work environments. *Id.* Given the strength of the medical evidence in this case, the ALJ did not find that Irelan's own testimony regarding her ability to work and the severity of her limitations was fully credible "to the extent those statements allege a level of disabling symptoms which exceed what the objective evidence and clinical findings could reasonably be expected to produce and which limitations are inconsistent with [her] activities of daily living." *Id.*

Therefore, and with the guidance of a vocational expert who testified at Irelan's hearing, the ALJ found that Irelan "is unable to return to her past relevant work as a data entry operator but is capable of performing her past relevant work as a supervisor of data entry operators." Record at 28. Furthermore, the ALJ concluded that, even given her limitations, Irelan was capable of performing a significant number of jobs in the national economy. *Id.* (listing as examples positions in computer software tutoring, technical use, and retail sales). The ALJ concluded, therefore, that Irelan was not disabled within the meaning of the Social Security Act. *Id.*

### 2. *Medical and vocational evidence*

The relevant evidence in this case consists of voluminous medical reports, and the testimony of both Irelan and a vocational expert. The evidence is summarized below.

Most of the evidence indicates that Irelan suffers from deterioration in her cervical spine. In particular, Dr. Ranjan Sachdev, an orthopedist who examined Irelan on January 9, 1992, diagnosed her with cervical spondylosis and lateral epicondili-

tis after an office examination. Record at 448. An MRI conducted by Dr. Jay Kleinman on January 24, 1992 confirmed the diagnosis of spondylosis, *see* Record at 229, 402, 450, as did a March 6, 1992 myelogram ordered by Dr. Ghodrat Daneshdoost, a neurosurgeon to whom Sachdev referred Irelan. *See* Record at 401–02 (confirming deterioration at cervical vertebrae C4–5 and C5–6, and stenosis at C6–7).

When he first saw Irelan in January, 1992, Dr. Daneshdoost noted Irelan's complaints that, when she used a computer for data entry, "she always has to turn her head toward the left side, and can never look straight ahead." Record at 402. At the time, however, Dr. Daneshdoost found that Irelan had only a "mildly limited" range of motion in her neck, and a normal range of motion in her shoulders. *Id.* When Irelan continued to complain of pain several months into a treatment program that incorporated physical therapy, myoflex, and muscle relaxants, *see* Record at 398, Dr. Daneshdoost referred her for electrodiagnostic studies, which had normal results. Record at 400. Dr. Paul Raphael, who conducted the studies, found "no evidence of an Entrapment Syndrome, Peripheral Neuropathy, Root Level Problem, or Plexus Lesion." *Id.*

On December 4, 1992, Dr. Clifford Vernick, an orthopedist, conducted a follow-up evaluation with regard to Irelan's continued neck and shoulder complaints, and elbow pain. Record at 195. He opined that Irelan suffered from "degenerative joint disease of her cervical spine with some exacerbation of her underlying disease, secondary to maintaining her head in a position for a prolonged period of time" while inputting data. Record at 196. As Irelan points out, Dr. Vernick wrote, "I do not believe that there will be a full recov-

ery in this situation due to the underlying degenerative joint disease." *Id.*

Nevertheless, Vernick found that, as of the time of his 1992 examination, Irelan was able to work, if her functional limitations were accommodated. *See* Record at 195–96. In particular, Vernick wrote:

> [S]hould the patient be able to participate in a work situation which does not necessitate her maintaining her head in one position for a prolonged period of time, or placing her upper extremities in such a position that will exacerbate her lateral epicondylitis of her elbows, she may well be able to function at a relatively good level.

Record at 196. In a form filled out at the request of a rehabilitation consultant, Dr. Vernick indicated that Irelan could return to full-time, sedentary work, and was able to sit for six hours a day, and walk and stand for two hours each. Record at 202.

Vernick re-examined Irelan on April 20, 1994. Record at 442. At that time, he observed a "generalized restriction in the range of motion of the cervical spine without associated paravertebral muscle spasm," and confirmed his previous diagnosis of degenerative joint disease of her cervical spine in association with lateral and medial epicondylitis of the left elbow. Record at 443. Dr. Vernick also wrote:

> Despite the fact that Ms. Irelan feels before chiropractic treatment she was almost totally disabled, I do not find objective evidence at the time to substantiate the need for ongoing chiropractic treatment. I believe that her personal life has been quite stressful and that there is certainly an emotional component to her present continued somatic complaints. Again, I believe that she is capable of returning to work at this time with the accompanying physical capacities restrictions. Certainly, alternative types of employment would be desireable that would not place her upper extremities under undue stress ... I do not feel that full recovery is to be anticipated in this situation. I feel that Ms. Irelan would benefit from psychological testing and her subjective symptoms are not substantiated in large part by her objective findings.

*Id.*

An MRI taken on December 12, 1994, showed some deterioration in Irelan's condition, and indicated possible nerve root impingement, but recommended clinical correlation of the findings. Record at 227. However, on September 18, 1997, neurosurgeon Dr. Zev Elias, having reviewed the myelogram and two MRI studies, reported to Irelan's general practitioner only that Irelan had "mild degenerative changes" that did not require surgical intervention, and that he could find no objective evidence of radiculopathy (nerve root disease) or of myelopathy (functional disturbances or changes in the spinal cord). Record at 317–18.

Irelan was evaluated three times by physicians from the Pennsylvania Bureau of Disability Determination. First, Dr. H. Olewiler examined Irelan on September 17, 1996, and found that Irelan demonstrated "bilateral upper extremity weakness," and a limited range of motion in her neck, but a full range of motion in all of her extremities. Record at 294, 297.

Second, Dr. Joseph Diconcetto, also of the Pennsylvania Bureau of Disability Determination, examined Irelan on December 7, 1998, and generated a detailed report detailing Irelan's account of her pain and limitations and his own physical findings upon examination of her. Record at 524–28. Dr. Diconcetto also completed a form detailing his statement of Irelan's abilities to perform work-related physical activities. Record at 531. In that form, Dr. Diconcetto indicated that Irelan could occasionally lift 20 pounds, and frequently lift ten

pounds, but that her ability to push and pull with her upper extremities was indeed limited. Record at 531. Dr. Diconcetto also pointed out, however, that Irelan was not limited in standing, walking, sitting, or other physical functions such as reaching, handling, and fingering, *id.* at 531–32, and ultimately recommended only that Irelan avoid heights and moving machinery. *Id.* at 532.

Third, Dr. Steven Sher of the Pennsylvania Bureau of Disability Determination examined Irelan on May 17, 1999. Record at 550. After examining Irelan, Dr. Sher wrote that she had the full range of motion with adequate strength and symmetry of the upper and lower extremities, that she had tenderness and mild myospasm in her trapezia muscles. Record at 552. Such findings are fully consistent with those of other physicians who had occasion to examine Irelan. The only respect in which Dr. Sher's examination differs from those of others is in his suggestion that degenerative joint disease would have to be ruled out. Record at 553. Dr. Sher also suggested "symptom magnification" as a potential cause of Irelan's pain and symptoms. *Id.*

Moreover, three other agency doctors conducted largely conclusory physical residual functional assessments of Irelan. Because the signatures on these forms are illegible, these doctors are impossible to identify by name. The first, evaluating Irelan on September 20, 1996, Record at 305, found that Irelan could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand, sit and walk with normal breaks for about six hours in an eight-hour workday, and do unlimited pushing or pulling, subject to her lifting and carrying restrictions. Record at 299. The second, evaluating Irelan on December 14, 1998, Record at 548, and found that she could occasionally lift or carry 100 pounds or more, frequently lift or carry 50 pounds or more, stand, sit and walk with normal breaks for about six hours in an eight-hour workday, and do unlimited pushing or pulling subject to her lifting and carrying restrictions. Record at 542. The third, evaluating Irelan on June 4, 1999, Record at 561, concluded that Irelan could frequently lift or carry 50 pounds, frequently lift or carry 25 pounds, stand, walk or sit for six hours of an eight-hour workday, and do unlimited pushing and pulling, subject to her lifting and carrying restrictions. Record at 555.

Of all of those who have evaluated Irelan, only her general practitioner, Dr. Ruth Frye, who treated Irelan from August 1992 through her hearing date, has indicated that Irelan is permanently disabled. Record at 584. As the Magistrate Judge noted, "[i]n an April 29, 1998 form Dr. Frye completed for Irelan as part of her application for welfare, Dr. Frye checked off that Irelan was permanently disabled, due to cervical neuropathy secondary to degenerative disc disease." Report and Recommendation at 9; Record at 584.

In a January 19, 1998 Medical Assessment of Ability to Do Work–Related Activities (Physical) form, Dr. Frye stated Irelan's physical limitations as follows: (1) maximum lifting capacity set at 5 pounds occasionally, and no weight frequently, (2) standing limited to 20 minutes without interruption and to a total of two hours per day, (3) sitting limited to 45 minutes without interruption and to a total of 8 hours per day, (4) inability to climb, stoop, kneel, balance, crouch or crawl, and (5) that her ability to reach, handle and push or pull was limited by her impairments. Record at 405–08.

In a June 5, 2000 Medical Assessment of Ability to Do Work–Related Activities (Physical) form, Dr. Frye reiterated her opinion that Irelan could carry only 5

pounds occasionally and no weight frequently. Record at 571. Addressing limitations on Irelan's ability to stand and walk, Dr. Frye explained that Irelan had to change positions, standing to sitting and vice versa, frequently, because staying in one position increased Irelan's pain. *Id.* She stated, however, that Irelan could stand, walk or sit for a total of 4 hours in an eight-hour workday, for a maximum of one hour without interruption. *Id.*

In addition to the medical evidence in this case, the ALJ heard and examined the testimony of Dr. Julius Romanoff, a vocational expert, who testified that Irelan could return to her past work as a data processing supervisor. Record at 67–68. Dr. Romanoff stated that data processing supervisors typically do not keypunch, but rather oversee what others are doing and enter data only occasionally, so that Irelan's limitations would not preclude her from performing that type of work. Record at 81–82. Dr. Romanoff did state, however, that because the amount of keypunching required in Irelan's former position had increased from twenty percent to one hundred percent of her workday, her limitations precluded her from holding that particular job. *Id.*

### D. Application of the Substantial Evidence Standard

As noted above, Irelan has raised several objections to the Magistrate Judge's Report and Recommendation. She argues that the Magistrate Judge erred in concluding that the ALJ's decision was supported by substantial evidence on the record because: (1) the ALJ failed to give proper weight to the opinions of plaintiff's treating physician, Dr. Ruth Frye, (2) the 1994 opinion of Dr. Clifford Vernick, on which the ALJ relied, was issued seven years before the ALJ made his decision on Irelan's eligibility for SSI and DIB benefits, (3) the ALJ, along with the Magistrate Judge, misinterpreted Dr. Vernick's 1992

and 1994 evaluations as suggesting that plaintiff could return to full-time, sedentary work, (4) the Magistrate Judge determined that Irelan was magnifying her symptoms based only on a single comment by a one-time examiner, (5) the vocational expert's testimony at plaintiff's hearing did not support the idea that plaintiff could return to work and was not supported by proper references to the Dictionary of Occupational Titles, (6) plaintiff's meager social life and part-time status as a student do not suggest that her claims of pain are unsubstantiated, and (7) that the Magistrate Judge failed to find adequate support for the ALJ's determination that plaintiff was not credible regarding her complaints of pain. Each of these arguments will be addressed in turn.

### 1. The weight to be accorded the opinion of Irelan's treating physician, Dr. Ruth Frye

The pivotal question in the determination of Irelan's eligibility for SSI benefits is the weight to be accorded the opinions of Irelan's treating physician, Dr. Ruth Frye, the only medical practitioner to label Irelan permanently disabled. Irelan contends that both the ALJ and the Magistrate Judge erroneously relied on statements by state agency doctors whose signatures are illegible, whose credentials are unknown, who never met or examined Irelan, and who reviewed only part of Irelan's medical records, which in some cases predated the ALJ's decision by five to seven years, as substantial evidence to refute the reports compiled by Dr. Frye, Irelan's treating physician. For the reasons that follow, the court does not agree.

"In considering a claim for disability benefits, greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant." *Adorno v. Shalala,* 40

F.3d 43, 47 (3d Cir.1994). Indeed, the Third Circuit has acknowledged that "[u]nder applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir.2001) (citing 20 C.F.R. § 404.1527(d)(2)).

However, "a statement by a plaintiff's treating physician supporting an assertion that she is 'disabled' or 'unable to work' is not dispositive of the issue." *Adorno,* 40 F.3d at 47–48. Rather, "[t]he ALJ must review all the medical findings and other evidence presented in support of the attending physician's opinion of total disability," *id.* at 48, and "must weigh the relative worth of a treating physician's report against the reports submitted by other physicians who have examined the claimant." *Id.; see also Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000) (stating that if an ALJ chooses to reject the opinion of the treating physician, however, he is prohibited from making "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his ... own credibility judgments, speculation or lay opinion.") (quotations omitted). In fleshing out the treating physician's rule, 20 C.F.R. § 404.1527 supplies an applicable framework in which to analyze the weight to be accorded a treating physician's opinions.

According to 20 C.F.R. § 404.1527, the medical opinion of a claimant's treating physician is given controlling weight on the issue of the nature and severity of a claimant's impairments if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record ...." 20 C.F.R. § 404.1527(d)(2).

When giving the treating physician's opinion controlling weight is not warranted, the ALJ will consider six factors in determining the proper weight to be accorded that opinion. *Id.* First, the ALJ will consider the length of the treatment relationship, and will award more weight to the opinion of a treating source who has seen a claimant "a number of times and long enough to have obtained a longitudinal picture of [the] impairment" than to the opinion of a nontreating source. 20 C.F.R. § 404.1527(d)(2)(i).

Second, the ALJ will consider the nature and extent of the treating relationship through an examination of "the treatment the source has provided and [of] the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." 20 C.F.R. § 404.1527(d)(2)(ii). Generally, the more knowledge a treating source has about a claimant's impairment, the greater the weight the ALJ will accord to the treating source's opinion. *Id.*

Third, using the same criteria that apply in evaluations of the opinions of nontreating physicians, the ALJ will then assess whether the opinion before him is supportable. 20 C.F.R. § 404.1527(d)(3) explains the relevant considerations:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evi-

278

dence in your claim, including opinions of treating and other examining sources. 20 C.F.R. § 404.1527(d)(3).

Fourth, the ALJ must consider whether the opinion is consistent with the record *as a whole.* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Fifth, the ALJ must consider whether the treating physician was a specialist, and will "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). Finally, the ALJ will consider any other factors brought to his attention "which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d)(6).

■ An examination of Dr. Frye's reports within this framework, and particularly under the last four factors of the inquiry, reveals that, regardless of the fact that Dr. Frye was Irelan's long-time treating physician, her reports cannot be assigned significant weight in a determination of whether Irelan was disabled. First, Dr. Frye presented no objective medical evidence and provided no medical explanations to support her conclusions that Irelan was completely disabled, as recommended under 20 C.F.R. § 404.1527(d)(3). For example, on the form that Frye completed for Irelan on April 29, 1998 in connection with Irelan's application for welfare benefits, Dr. Frye checked a box indicating that Irelan was "permanently disabled," and stated only

that her diagnosis was cervical neuropathy secondary to degenerative disc disease. Record at 584. Moreover, the medical assessment form that Dr. Frye completed on June 5, 2000 contained, for each limited activity, a space in which the doctor was to indicate the medical findings that supported her assessment of the physical limitation that she had just listed. Record at 571. Dr. Frye responded with reference to Irelan's patient history and Irelan's subjective complaints of pain; she made no reference to any objective medical testing, specific diagnostic test results or detailed clinical examination findings. *See* Record at 571–73. The same is true with respect to Dr. Frye's responses on the medical assessment form that she completed for Irelan on January 19, 1998. *See* Record at 405–07. As both the ALJ and the Magistrate Judge noted, the conclusory nature of Dr. Frye's reports decreases their overall significance, and the relative weight that they can be accorded during an evaluation of the medical evidence in Irelan's case.

Second, Dr. Frye's findings regarding the extent of Irelan's physical limitations are not consistent with the findings evidenced by the record as a whole. No other doctor who examined Irelan, most of whom provided much more detailed findings and analysis than did Dr. Frye, found Irelan to be disabled by deterioration in her cervical spine in combination with epicondylitis, *see* Record at 196, 202, 404, 443,[2] or advocated activity restrictions as extreme as those stated by Dr. Frye. *See*

2. The notes of Dr. Ghodrat Daneshdoost indicate that he released Irelan for a sedentary job at full-time hours, despite her complaints of neck and left upper arm pain on September 28, 1992. Record at 404. Dr. Clifford Vernick, also examining Irelan in 1992, reported that Irelan would be able to function "at a relatively good level" at a job which did not require that she maintain her head and

arms in positions that aggravated her conditions. Record at 196. Dr. Vernick subsequently indicated on a form that Irelan could return to full-time, sedentary work. Record at 202. In 1994, Dr. Vernick re-evaluated Irelan, and stated that he found that she was able to return to work. Record at 443. The issue of the temporal remoteness of Dr. Vernick's opinions is addressed in detail, *infra*.

Record at 196, 296–97, 299, 404, 443, 444, 447, 542, 555. In this context, the ALJ did not use the conclusory opinions of the state agency doctors, as Irelan contends, to refute singlehandedly the reports issued by her treating physician.[3] Rather, these state agency reports merely make up a part of the record, which, considered *as a whole,* contradicts Dr. Frye's assessment of her patient's abilities.

Moreover, as the ALJ noted, Irelan's reported activity level also undermined Dr. Frye's opinion that she would not be able to sustain employment. The record reveals that Irelan was able to take college courses, albeit with accommodations, maintain a 3.96 grade point average, and carry her coursebooks as long as she used three separate bookbags. Record at 62–63. Irelan further indicated that she was able to do light dusting, go shopping in a mall, drive a car in spite of discomfort, and travel to Florida once a year to visit her children. Record at 50–51.

Third and finally, Dr. Frye was not a specialist in the area of orthopedics, but rather saw Irelan as a general practitioner. Therefore, her opinion was justifiably given less weight than the opinions rendered by the specialists who examined Irelan. *See* 20 C.F.R. § 404.1527(d)(5).

Considering these factors as a whole, the ALJ and Magistrate Judge justifiably concluded that Dr. Frye's conclusory and objectively unexplained findings, rendered in an area that was not her specialty, and contradicted by the bulk of the opinions rendered by the examining physicians in the case, and by her patient's own account of her abilities, were not entitled to significant, much less controlling, weight in the determination of whether Irelan was disabled. *See* 20 C.F.R. § 404.1527(d).

2. *Reliance on Dr. Vernick's 1994 evaluation*

Irelan also contends that Dr. Clifford G. Vernick's 1994 evaluation of Irelan cannot constitute substantial evidence on the record supporting a determination that Irelan was not disabled, because it was completed in 1994, seven years before the ALJ's determination of her eligibility for SSI, and was therefore so temporally remote that it had minimum relevance to the claim period. The court does not agree.

20 C.F.R. § 404.1527(d) also provides a useful framework for evaluating the weight to be given the opinions of non-treating physicians. Under this provision, factors in determining the weight of a medical opinion rendered by a nontreating source are the nature of the examining relationship, the nature of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the physician offering the opinion. *See* 20 C.F.R. § 404.1527(d). Temporal remoteness could justifiably be considered as one of many miscellaneous factors that also affect the weight to be accorded a particular medical opinion. *See* 20 C.F.R. § 404.1527(d)(6). With these principles in mind, the court turns to an evaluation of Dr. Vernick's 1994 report.

■ Dr. Vernick's report indicates that he was an orthopedist, a specialist, who had been engaged to conduct independent medical examinations of Irelan on two occasions in a two year period. *See* Record

---

**3.** Indeed, upon consideration of the record as a whole, the ALJ actually rejected the findings of these state agency doctors to the extent that they suggested that Irelan's upper extremity impairments would not preclude her from performing work at medium to heavy levels of exertion. Record at 25. The ALJ stated, however, that he found "fully reasonable the opinions of these medical consultants that claimant has been capable of sedentary and light duty work." *Id.*

at 195, 442. An examination of Vernick's 1994 report reveals that it was fully supported; Vernick detailed Irelan's past and current complaints of pain, the treatments that she had received over time, her personal and work history, the physical examination that he himself conducted of her, and his particular conclusions as to the physical limitations that each of his tests revealed. *See* Record at 442–43. Moreover, Dr. Vernick's diagnosis of degenerative joint disease of her cervical spine and lateral and medial epicondylitis, and his assessment of her abilities, *see* Record at 443, is completely consistent with those generated by the vast majority of other doctors who evaluated Irelan both before and during the claim period. *See* discussion, *supra.* Indeed, as the Magistrate Judge noted, "[a]gainst the weight of all . . . medical evidence, only Irelan's general practitioner, Dr. Ruth Frye, has opined that Irelan is completely incapacitated." Report and Recommendation at 9. In this context, even taking into account the distinct possibility that Irelan's condition could degenerate over time, and thus render Dr. Vernick's 1994 opinion less relevant to the ultimate question of whether she was qualified for SSI at the time of her hearing, it cannot be said that the temporal remoteness of the opinion alone prevents it from constituting substantial evidence on the record that Irelan was not disabled by her condition.

Furthermore, it cannot be said that the ALJ afforded Dr. Vernick's opinion undue weight in comparison to the more current medical evidence offered by Dr. Frye. To the extent that the ALJ focused on Dr. Vernick's 1994 opinion at all, it was to highlight the substantive inadequacies that plagued Dr. Frye's more recently generated reports, which were wholly devoid of explanations for the conclusions that they contained. The ALJ wrote:

> The . . . opinion of Dr. Vernack (sic) recognizes that claimant's symptomatol-

ogy and her limitations relate to problems in her upper extremities and not her lower extremities. In contrast to his well reasoned limitations, Dr. Frye provided far reaching limitations on functions relating to claimant's lower extremities without providing an explanation of the rationale for these limitations. Record at 25. This explanation reveals that the ALJ in fact focused on analyzing the more recently generated materials with which he was presented, rather than unduly relying on an older report, and that the more current materials were rendered less influential due to their own inadequacies. Even so, however, the supportability of Dr. Vernick's report, its consistency with the record as a whole, and the fact that it was issued by a specialist render it substantial evidence on the question of Irelan's disability, even given though the report was generated long before her administrative hearing.

### 3. *Alleged mischaracterization of Dr. Vernick's conclusions*

Irelan then argues that the Magistrate Judge "is incorrect when [he] characterizes the 1992 or 1994 suggestion of Dr. Vernick . . . that Ms. Irelan could return to full time, sedentary work." Pl.'s Exceptions to the Report and Recommendation of the Magistrate Judge at 2 [hereinafter Pl.'s Exceptions]. In particular, Irelan refers to a 1994 Physical Capacities Checklist for Upper Extremities, in which Vernick indicated that Irelan could only occasionally use her hands and arms to push, pull, carry or lift less than, but never more than, ten pounds, that she could only occasionally maintain her head and neck in a stationary position, and never engage in frequent flexing or rotation of the area, and that she lacked a power grip and the ability to rotate her forearms. Record at 444. Irelan argues that, based on these reported limitations, "Dr. Ver-

nick's description of Ms. Irelan's capacity for work renders her capable of less than the full range of sedentary work." Pl.'s Exceptions at 3. Therefore, Irelan's contention is that the Magistrate Judge misapprehended the nature and import of the evidence before him when he determined that Irelan was capable of working. The court does not agree.

It is not disputed that Irelan cannot perform the full *range* of sedentary work. Even though Dr. Vernick cleared her for full-time, sedentary work in a Physical Capacities Evaluation Form completed for Delaware Valley Rehabilitative Services in 1992, Record at 201–02, he clarified in a detailed opinion that Irelan "may well be able to function at a relatively good level" in a work situation that did not require her to maintain her head or arms for a prolonged period of time in positions that would exacerbate her conditions. Record at 196. Similarly, upon reevaluating Irelan again in 1994, Dr. Vernick stated that he believed Irelan to be "capable of returning to work at this time *with the accompanying physical capacities restrictions.*" Record at 443 (emphasis supplied). None of these comments suggest that Irelan cannot perform full-time, sedentary work, but rather that she can, when and if provided with proper accommodations. Accordingly, both of Dr. Vernick's opinions constitute substantial evidence on the record supporting a denial of benefits in this case.

### 4. *The possibility of "symptom magnification"*

In another objection to the Report and Recommendation, Irelan focuses on the Magistrate Judge's treatment of a comment by one-time examiner Stephen Sher, who stated, as part of his report, that possible symptom magnification would have to be assessed and ruled out as a cause for Irelan's pain and symptoms. Record at 553. Irelan contends that this comment cannot constitute substantial evidence to support a denial of benefits. The court does not agree.

Irelan misapprehends the significance of Dr. Sher's report to her overall disability determination. Dr. Sher's report has significant weight in the ultimate determination of Irelan's eligibility for SSI primarily because its overall findings as to the objective manifestations of Irelan's condition are consistent with those of other examining physicians in this case. As the Magistrate Judge correctly noted, Dr. Sher's opinion is "notable," i.e., different, from the opinions rendered by others, because it suggests symptom magnification as one (of many) *possible* medical causes for Irelan's pain and one that should be evaluated in the future. Report and Recommendation at 9. Moreover, Dr. Sher's reference to symptom magnification does not inject a new diagnosis and a new issue into the case, but rather is consistent with other parts of the record. In particular, Dr. Sher's remark reflects that he had noticed, as had Dr. Vernick in 1994, that Irelan's "subjective symptoms are not substantiated in large part by her objective findings." Record at 443. Therefore, both the comment, and the report that contains it, constitute substantial evidence in the ultimate determination of Irelan's eligibility for disability benefits.

### 5. *The testimony of vocational expert Dr. Julius Romanoff and the impact of his failure to provide DOT references*

Irelan next argues that the testimony of Dr. Julius Romanoff, the vocational expert who testified at her hearing before the ALJ, did not support a conclusion that Irelan could return to her job as she performed it several years before she left work. This is so, Irelan contends, because Dr. Romanoff based his opinion on an as-

sumption that her former job required her to enter data for only twenty percent of her workday, and did not consider that the job necessitated activities that required additional use of her hands to complete clerical, accounting, and scheduling tasks. Thus, Irelan argues that she obviously lacked the bilateral dexterity to do the job that the vocational expert described. She also appears to advance an argument that Dr. Romanoff's testimony as to what activity would be required is not consistent with the level of activity reported in the Dictionary of Occupational Titles, and faults Dr. Romanoff for failing to provide DOT numbers to correspond with his testimony Pl.'s Exceptions at 3.

█ As the Magistrate Judge noted, S.S.R. 82–62 governs the inquiry into whether a claimant may return to past work through "a determination of the 'physical and mental demands of jobs a claimant has performed in the past.'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 123 (3d Cir.2000) (quoting and applying S.S.R. 82–62). The regulation clearly states that "[t]he *claimant* is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." S.S.R. 82–62 (emphasis supplied). Indeed, "[i]t is clear error to make a past relevant work determination that is contrary to uncontroverted evidence presented by the claimant." *Burnett*, 220 F.3d at 123. Relevant information as to past relevant work includes: (1) the individual's statements as to which past work requirements can no longer be met and the reason for the inability to meet those requirements, (2) medical evidence establishing how the impairment limits ability to meet the requirements of the work; and (3) *in some cases*, supplementary or corroborative information from other sources such as the Dictionary of Occupational Titles. *Id.* (quoting S.S.R. 82–62).

In this case, Irelan's testimony was the primary source of information on the requirements of her past relevant work as a data entry supervisor.[4] Irelan testified that, until her company downsized "a year or two" before her injury, she keypunched "only when necessary." Record at 44–45. As supervisor, Irelan organized and ran her office, supervised ten employees, handled hiring and firing, learned new software when required, designed data screens, and did payroll, orders, and inventory. Record at 42–44. Irelan testified that she was required to stand "to walk around and load and unload the files that came in for working priority," Record at 43, and that her job necessitated roughly two hours of standing per day. Record at 44. Irelan's testimony suggests that she performed minimal lifting and carrying as part of her job. *See* Record at 43–44 ("I'd have to take the completed ... sheets, only the sheets, the departments were responsible for coming up and getting them down to the computer room.").

Given this account of the demands of Irelan's job as she originally performed it, the vocational expert, and the ALJ, justifiably concluded that Irelan could perform this form of past relevant work. First, Irelan made no statement as to the particular work requirements, if any, she could no longer perform as a result of her im-

---

4. The record in this case reveals that Dr. Romanoff was present throughout Irelan's hearing before the ALJ. Record at 35. Therefore, although Irelan was specifically questioned while Dr. Romanoff was on the stand as to the amount of typing that her job had required, Record at 81, he was present for her earlier testimony as to other activities for which she was responsible.

pairment. Second, as discussed in detail above, the medical evidence in this case contradicts Dr. Frye's assessment of the severity of Irelan's impairments. *See, e.g.,* Record at 443–44 (stating the belief that Irelan could return to work with some physical capacity restrictions). Third, given the specificity of information that Irelan was able to offer concerning the actual duties of her past work as it was when she originally performed it, it does not appear that resort to the Dictionary of Occupational Titles for a job description or for DOT references was warranted in her case.[5]

### 6. *The use of evidence of Irelan's personal life*

Irelan contends that the Magistrate Judge erred in considering her "meager social life," and the fact that she was able to succeed, with accommodations, as a part-time student to be evidence that her claims of pain were not substantiated. *See* Pl.'s Exceptions, at 4. Irelan asserts that this evidence was "not significant, particularly in view of an MRI report which finds significant disc disease which is likely to cause the pain described." *Id.* This argument, which appears to be directed at the way that the Magistrate Judge weighed Irelan's account of her activities relative to

the clinical findings in a particular MRI, is unavailing for the following reasons.

First, it is axiomatic that the ALJ's findings of facts must be supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In a context where more than one examining physician has suggested that the objective medical findings in Irelan's case did not fully substantiate her subjective complaints of pain and symptoms, *see* Record at 443, 553, it is reasonable and, indeed, wholly unsurprising that the ALJ looked outside the medical evidence, and therefore to Irelan's actual reported activities in her daily life to evaluate the extent of her claimed impairment. There is no authority for the proposition that the ALJ should be limited to evaluating only the medical evidence when his mission is to evaluate the record as a whole.

Moreover, the particular MRI report to which Irelan refers reports only the clinical findings of the reader;[6] it makes no link between those findings and Irelan's level of reported pain and associated im-

---

**5.** In a related exception to the Report and Recommendation, Irelan argues that the Magistrate Judge erred in failing to address an issue raised in her brief, namely that Dr. Romanoff's testimony as to jobs that did not require more than occasional use of the hands (i.e., those of retail computer seller, computer teacher, computer tutor, information clerk, interviewer, receptionist, hostess, light cashier and inside attendant), Record at 68–72, was inconsistent with the descriptions of those jobs as set forth in the Dictionary of Occupational Titles. Beyond her bare assertion that inconsistencies exist, Irelan offers no textual support for her claim, and for that reason, her claim must fail. In any event, because the court concludes that the record

as a whole contains substantial evidence supporting the conclusion that Irelan could perform her past relevant work as a data entry supervisor, a discussion of the manual dexterity requirements of other jobs are not warranted.

**6.** Dr. Kleinman states his impression of MRI readings as follows:

Protruding disc at C4–5 and C5–6. The protrusion is asymmetric at the C5–6 level on the left possibly due to protruding disc and/or vertebral spur. Slight left-sided deformity of the thecal sac just below the C7–T1 level of uncertain etiology. CT would further evaluation (sic) this.

Record at 229, 450.

pairment. *See* Record at 229, 450. Even though the MRI indicates that Irelan suffers from disc disease, "[o]nce an ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, he ... must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir.1999). Therefore, the diagnosis of a serious condition informs, but does not control, the ALJ's inquiry into what activities a claimant is physically capable of performing, and Dr. Kleinman's MRI report does not render insignificant Irelan's testimony as to her actual abilities, notwithstanding her diagnosis of disc disease. Accordingly, the ALJ, and the Magistrate Judge, appropriately considered evidence of Irelan's daily activity substantial evidence of the actual extent of her physical limitations.

### 7. *Irelan's credibility regarding her complaints of pain*

In her final exception to the Report and Recommendation, Irelan argues that the Magistrate Judge erred in not rejecting the ALJ's conclusion that Irelan was not credible with respect to her complaints of pain. Irelan emphasizes that her claims of pain have been well articulated since 1992, and that the limited range of daily activities that she is able to perform do not undermine her claim that pain restricts her ability to work.

■■ The ALJ is empowered to evaluate the credibility of witnesses, *Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir. 1983), and his findings on the credibility of claimants "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.1997). When a claimant reports subjective complaints of pain, making the ultimate determination of whether that claimant is, in fact, disabled, "obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain and the extent to which he ... is disabled by it," *Hartranft,* 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)), and the ALJ may "reject the claimant's claim of disabling pain if he affirmatively addresses the claim in his decision, specifies the reason for rejecting it, and has support for his conclusion in the record." *Hirschfeld v. Apfel,* 159 F.Supp.2d, 802, 811 (E.D.Pa.2001).

■ In this case, the ALJ provided sufficient support for his determination that Irelan's claims of disabling pain were not credible. In particular, the ALJ stated that he did not find Irelan's claims as to her functional capacity, ability to work, and severity of her symptoms credible "to the extent those statements allege a level of disabling symptoms which exceed what the objective evidence and clinical findings could reasonably be expected to produce." Record at 26. As discussed in great detail above, the weight of the medical evidence in this case amply supports the ALJ's conclusion.

The ALJ also noted that Irelan's "alleged limitations are inconsistent with claimant's activities of daily living which include her activities of shopping at the mall, her ability to drive a car, her visiting her daughter in Bethlehem an average of three times per week and her trips to Florida occurring about once per year." *Id.* Because the ALJ, rather than this court, had the opportunity to witness firsthand Irelan's testimony in this case, appropriate deference is due to his determination of her credibility. *See Walters,* 127 F.3d at 531.

## III. CONCLUSION

For the foregoing reasons, the court adopts and approves the Report and Recommendation of Magistrate Judge Hart. Summary judgment is granted in favor of defendant, Commissioner of Social Security, and against plaintiff, Georgine Irelan. An appropriate order follows.

### *ORDER*

**AND NOW**, this **28th** day of **January, 2003,** upon consideration of the pleadings and the record herein, and after review of the Report and Recommendation of United States Magistrate Judge Jacob P. Hart, and plaintiff's objections, it is hereby **ORDERED** that:

1. The Report and Recommendation is **APPROVED** and **ADOPTED**.

2. The plaintiff's motion for summary judgment (doc. no. 7) is **DENIED**.

3. The defendant's motion for summary judgment (doc. no. 10) is **GRANTED**.

**AND IT IS SO ORDERED.**

### *ORDER*

**AND NOW**, this **28th** day of **January, 2003,** it is hereby **ORDERED** that judgment is entered in favor of defendant, Commissioner of Social Security, and against plaintiff, Georgine Irelan.

**AND IT IS SO ORDERED.**