# United States Court of Appeals
## For the First Circuit

No. 00-2594
No. 01-1015

IVY MELÉNDEZ-ARROYO,

Plaintiff, Appellant/Cross-Appellee,

v.

CUTLER-HAMMER DE P.R. CO., INC.,

Defendant, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., <u>Senior U.S. District Judge</u>]

Before

Boudin, <u>Chief Judge</u>,

Cyr, <u>Senior Circuit Judge</u>,

and Lynch, <u>Circuit Judge</u>.

<u>Judith Berkan</u> with whom <u>Mary Jo Mendez</u> and <u>Del Toro & Santana</u> were on consolidated brief for plaintiff.
<u>Russell A. Del Toro</u> with whom <u>Roberto Santana-Aparicio</u> and <u>Del Toro & Santana</u> were on consolidated brief for defendant.

BOUDIN, <u>Chief Judge</u>.  Ivy Melendez brought suit against her employer, Cutler-Hammer de Puerto Rico ("Cutler-Hammer"), under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (1994), and under Puerto Rico law.  Following discovery, the district court granted Cutler-Hammer's motion for summary judgment on the merits, and Melendez now appeals. Cutler-Hammer cross appeals to contest the district court's denial of its own summary judgment motion which sought a ruling that Melendez's suit was time-barred.

Melendez began working for Westinghouse in 1968 and until 1998 held a succession of accounting-related positions with the company and its successor in interest, Cutler-Hammer. In 1984, she became the accounting manager at the Toa Baja plant in Puerto Rico, a large facility with over 1,000 employees.  In this position, she had broad responsibility for financial record keeping and analysis.  Her direct supervisor, from 1983 to 1989, and again from 1993 to February 1997, was Larry Cancel, the controller at the plant.

In January 1994, Eaton Corporation acquired the plant from Westinghouse and began to operate it as Cutler-Hammer de

Puerto Rico Company. Eaton then instituted new accounting programs for its new Puerto Rico plant; the new accounting system, tied in with Eaton's mainland operations, was in certain respects more complex than the Westinghouse system. Melendez continued as accounting manager after the acquisition but, in her later-filed lawsuit, she claimed that Cancel--from 1995 through 1997--made a number of adverse comments about her age and those of other employees with whom she worked. In l996, Melendez complained to the company's personnel department about Cancel, but the company took no action against him.

On February 14, 1997, Cancel, together with Luis Pizarro, the plant's human resources manager, met with Melendez and informed her that she would no longer be the accounting manager and would be transferred to a new position. According to Melendez, she understood that she was being demoted but was not told until May 1997 what her new responsibilities would be. In May she discovered that her new duties were fairly menial and involved no supervisory responsibility. However, incident to the February 1997 transfer, Melendez was given a 3 percent pay raise.

Almost immediately after the meeting, Melendez suffered serious depression and went on sick leave, which occupied a substantial portion of the time until May. She returned to work

on May 12, 1997, and continued until November 6, 1997, when her mother was hospitalized with a serious illness.  Her mother died on November 25, 1997.  Melendez's depressive symptoms then became substantially worse.  Although she attempted to return to work in January 1998, she required further treatment and in August 1998, the Social Security Administration found her disabled retroactive to November 6, 1997.

On or about March 4, 1998, Melendez filed an age discrimination charge with the Puerto Rico Department of Labor and the Equal Employment Opportunity Commission.  After receiving right to sue letters from both agencies, Melendez brought suit in the district court, claiming that she had suffered an adverse job action because of age discrimination. Cutler-Hammer countered by arguing that the lawsuit was time-barred because the administrative charges were filed 383 days after the February 14, 1997, meeting despite a statutory requirement that the charges be filed within 300 days.  29 U.S.C. § 626(d); American Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 122 (1st Cir. 1998).

On February 29, 2000, the district court rejected Cutler-Hammer's motion for summary judgment on limitations grounds.  The court found that factual issues precluding summary judgment were raised by two arguments offered by Melendez to

avoid the limitations bar: that her claim did not accrue until May 1997, when the scope of her new duties became clear and, in the alternative, that equitable tolling was justified because her substantial depression warranted a suspension of the statute of limitations.

In September 2000, Cutler-Hammer filed a second summary judgment motion, this one directed to the merits. On November 21, 2000, the district judge granted summary judgment in favor of Cutler-Hammer, dismissing the federal claim on the merits and the Puerto Rico law claim without prejudice. In a nutshell, the district judge found that Melendez had failed to counter Cancel's deposition testimony that she had not met the company's job expectations; alternatively, the district court said that Melendez had failed to show that she was constructively discharged by Cutler-Hammer. Melendez has appealed from this decision, and Cutler-Hammer has filed a cross-appeal on the limitations issue.

1. The pertinent provision of ADEA is comparatively straightforward: it is unlawful for an employer to refuse to hire, or to discharge or to "otherwise discriminate" against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Protection is limited to those 40 years old

or older, id. at § 631(a); Melendez was 56 years old as of February 1997. An applicant or employee who is aggrieved by an adverse job action taken against him or her because of age can bring a civil action under ADEA and can seek legal or equitable relief. Id. at § 626(c)(1).

To prevail on her federal claim of discriminatory treatment, Melendez had to show that she suffered an adverse job action, that this was motivated by age, and that she suffered injury as a result of it. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000). If she proved this, her employer could still avoid liability by showing that it also had legitimate grounds for its action that would have led to the same result (a so-called dual motive case). Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000). By contrast, under Title VII such a showing would merely limit the relief available to the plaintiff. 42 U.S.C. § 2000e-5(g)(2)(B).

We start with the issue of motivation. Quite commonly in discrimination cases--especially in hiring--the potential plaintiff knows only that he was not hired and has no specific evidence as to why this occurred. Possibly in response to this dilemma, the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), adopted what it called a prima facie case

approach by which an employer charged with racial discrimination in hiring could be made to explain its purported reason for its refusal to hire the plaintiff.

In substance, the Court said that the potential employee need at the outset show only that he or she met these conditions:  that he or she was a racial minority, applied for and was qualified for the position, was rejected and that the position remained open. If so, the "burden of production" shifted to the employer to offer an explanation or suffer a presumption of discrimination.  But, if the employer then offered a non-discriminatory explanation, the presumption disappeared, and the potential employee was required to show the employer's explanation was mere pretext for discrimination. McDonnell Douglas, 411 U.S. at 805.

This McDonnell Douglas approach has been adapted to other situations besides refusals to hire and to other civil rights statutes including the ADEA, but it is largely beside the point in this case.  That is so because Cutler has from the outset offered an explanation for its action:  it said that Melendez was not capable of performing as accounting manager under the new and more demanding accounting regime imposed by Eaton.  Indeed, it asserted that this judgment was made not only by Cancel but also by a mainland executive of Eaton named Don

Gardner, who offered an affidavit so claiming and describing the basis for his judgment. See Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 155 (1st Cir. 1990).

The question, then, at the summary judgment stage is whether Melendez has pointed to enough admissible evidence to create a factual issue for trial on the issue of motivation-- that is to permit a reasonable jury to conclude that the decision to demote her was taken or prompted by someone based on age-based stereotyping or hostility. Her evidence in this case is two-fold: first, evidence that Cancel entertained (and expressed) age-biased views and that he played a direct role in her demotion; and second, evidence casting reasonable doubt on the company's claim that she was demoted for incompetence.

By affidavit and deposition evidence, Melendez created a jury issue on the question whether Cancel held such views. She, or others, quoted him as saying, among other things, that the ages of his accounting employees added up to more than a thousand years; that his employees were as old as Methuseleh; that they were "old women," "a bunch of incapacitated people" and "useless old women" and that "what I have here is Social Security." Melendez also said that Cancel told her that she was an old hag, an old lady and that "her age didn't allow her to

think."  Compare Thomas v. Sears, Roebuck & Co., 144 F.3d 31, 34 (1st Cir. 1998).

Cancel denied making some of the comments attributed to him, and, as to others, he says that he was joking or simply repeating statements made by other employees.  However, he admits making some of the remarks and Melendez was not the only witness who reported them.  Her credibility is also supported by the fact that she complained to the personnel department about Cancel's attitude in 1996, well before any job action was taken against her.  Besides, which remarks he made and whether these were jokes or his actual views are credibility issues for a jury.

Cutler-Hammer acknowledges that Cancel played an operative role in the February 14 reassignment.  Indeed, he was Melendez's direct superior and after several years in this role quite familiar with her work.  He participated in the February 14 meeting and, while Pizarro too was present, Pizarro was not a specialist in accounting and did not claim to have made the decision.  Don Gardner's affidavit (as to which more below) said that he instructed Cancel that Melendez had to improve or be replaced--not that he ordered her demotion.

This brings us to the company's explanations for the February 14 action.  Thus far, we have only evidence that Cancel

held age-biased views and that he played a role in Melendez's demotion; he did not admit to being motivated by her age or even refer to it in the meeting and, instead, claimed to have been prompted by concerns about the quality of her work. But, if Melendez's own proffers were accepted by the jury, the explanations offered by the company could be deemed pretexts and turned against it. Reeves, 530 U.S. at 143.

Notably, the company says that while Melendez may have performed well in earlier years, new demands were placed on her after the transfer of control and she did not live up to them. But there appears to be almost no contemporaneous criticism of her work in writing prior to the demotion, whether as formal assessments or informal complaints or concerns about her performance. Almost all the criticisms appear as new assessments or, at best, claims made now as to what someone thought or heard at the time of the alleged mistake or omission by Melendez but never troubled to record.

Further, even now the company's newly detailed criticisms of Melendez--putting aside useless generalizations ("poor communications with the management")--are open to dispute. For example, Jason Hume, a mainland accounting manager with Cutler-Hammer, testified that he had dealt with Melendez for about a year ending in September 1995, and that her

explanations for variances between the income statement and the budget or forecast were incomplete, contradictory and not timely. But Hume admitted that he never told Cancel directly about these problems, and Melendez points out that the alleged problems occurred nearly two years before her demotion, and Hume pointed to no documentation for his criticism.

Cancel also claimed that Melendez never mastered a specialized Eaton purchasing and inventory system which admittedly did not operate properly at the Puerto Rico plant when it was introduced in 1996. However, Melendez pointed to testimony of Nayda Rosa, a cost accountant, who attributed the problems to the engineering department and stock room and said that Melendez was never mentioned as the cause of the problem and actually helped solve it. Pizzaro blamed Melendez for failing to master the new payroll accounting program as well, but Cancel admitted that he could not attribute problems with that program to Melendez.

The most comprehensive attack on Melendez's performance came from Don Gardner in an affidavit, saying that a number of persons in the organization complained about problems with Melendez's performance, leading to his own suggestion that she be either improved or removed. Two other affiants also criticized her work. However, the court ruled that Cutler-

-11-

Hammer had failed to provide the names of these witnesses in a timely manner and ordered their testimony excluded from the then anticipated trial for failure to meet the discovery deadline.

Cutler-Hammer says that these affidavits from Gardner and others were still competent for consideration at the summary judgment stage, but we fail to see why. The question on summary judgment is whether, based on the evidence available for presentation at trial, there is a factual issue for the jury. Where, as here, the court has excluded Gardner and the others as trial witnesses, it makes no sense to take account of such testimony in considering whether the jury would be forced to conclude that Melendez has been demoted for cause--the only basis for granting summary judgment against her. Cf. 10A Wright & Miller, Federal Practice and Procedure § 2722 (1998)

In granting summary judgment, the district court may have been misled by Cutler's argument that--to invoke the McDonnell Douglas presumption--Melendez had to show that she was "qualified" for the accounting manager position under the new Eaton regime and that she failed to counter the criticisms offered by Cutler. But, whatever the threshold showing of qualifications needed to invoke the presumption, Melendez's evidence--of Cancel's views, of her own prior record and of the flaws in the company's explanation for its actions--itself

creates a factual issue for trial.  See Loeb v. Textron, Inc., 600 F.2d 1003, 1018 (1st Cir. 1979).

Cutler argues in this court that evidence of Cancel's views did not constitute "direct" evidence of discrimination and was therefore inadequate.  Of course, it was "direct" evidence in the sense that it comprised statements attributed to Cancel himself that directly reflected his apparent views; but it was arguably not "direct" in the specialized sense that this court has used the phrase in discrimination cases, e.g., "statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision."  Febres, 214 F.3d at 60.

However, Cutler misunderstands the limited role of classifying evidence as direct or not for this purpose. Evidence meeting this high standard may be required, based on what appears to be the "swing" decision of Justice O'Connor in Price Waterhouse v. Hopkins, 400 U.S. 228, 277-78 (1989), in order to entitle a plaintiff to a so-called mixed motive instruction--that is, an instruction that the employer, where shown to have acted in part out of an illicit motive, bears the burden of persuasion to show that it would have made the same decision anyway based on legitimate motives.

-13-

At this stage, we are not concerned with whether either side might be entitled to a _Price Waterhouse_ instruction. Rather, the question is whether the evidence, taken as a whole, creates a factual issue as to whether the demotion was motivated by age. _Price Waterhouse_ is decidedly not a rule that direct evidence, as specially defined above, is necessary to defeat summary judgment for the employer; that task can be accomplished, even without resort to _McDonnell Douglas_, by any combination of evidence strong enough to permit the jury to infer discrimination. _Int'l Bhd. of Teamsters_ v. _United States_, 431 U.S. 324, 358 (1977); _Loeb_, 600 F.2d at 1018.

This brings us to Cutler-Hammer's alternative ground for its summary judgment motion which the district court also accepted. This is that Melendez was not constructively discharged but given a raise and reassigned to new duties. "Constructive discharge" is a label for treatment so hostile or degrading that no reasonable employee would tolerate continuing in the position. _Serrano-Cruz_ v. _DFI Puerto Rico, Inc._, 109 F.3d 23, 26 (1st Cir. 1997). Often used in cases of racial or sexual harassment, this doctrine provides a basis for computing damages not based merely on the temporary suffering but on the deprivation of employment. _Id._ at 28.

Any demotion is painful, but it would be difficult to describe Melendez's circumstances as equivalent to continuing sexual or racial harassment. However, neither the ADEA nor comparable statutes are limited to hiring and discharge decisions: any significant adverse job action based on age creates the basis for a claim. Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994). Not every minor advantage or status symbol is protected by the statute--"adverse action" is a rule of reason concept--but here a jury could reasonably decide that Melendez had suffered an adverse employment action.

Specifically, she was taken from a position of substantial responsibility supervising a number of employees, given no tasks whatever in the first instance and rather sketchy menial ones after several months. Her new duties included assisting the accounts payable clerk and manually comparing two sets of lists for discrepancies. She supervised no one and was isolated from other personnel. Cancel himself acknowledged that the transfer was, despite a small pay increase, a demotion.

2. Although we conclude that summary judgment on the merits was unjustified, Cutler-Hammer says that the district court should have granted the initial motion for summary judgment, determining that Melendez's administrative filings were out of time. The district judge denied this motion, saying

-15-

that there were issues of fact as to the accrual date and as to plaintiff's mental condition following her demotion. Cutler-Hammer seeks to cross-appeal to challenge this denial of summary judgment.

Cutler-Hammer cannot "appeal" from a judgment in which it entirely prevailed (the judgment dismissing Melendez's ADEA claim on the merits), and it is not entitled to seek review of an interlocutory denial of summary judgment (the earlier refusal to grant its time-bar motion).[1] However, it can defend the judgment it obtained--dismissal of the ADEA claim with prejudice--on any ground available to it, Olsen v. Correiro, 189 F.3d 52, 58 (1st Cir. 1999), and it would be wasteful for us to remand for a trial if the evidence showed the claim to be clearly barred.

Melendez's first and most familiar answer to the limitations claim is that the cause of action did not accrue, and the 300 days did not begin to run, until Melendez became aware of the full impact of the demotion. Melendez says this occurred on May 12, 1997, when she learned of the very limited new duties which she had been assigned. If the period did not

---

[1]Manchester Knitted Fashion, Inc. v. Amalgamated Cotton Garment and Allied Indust. Fund, 967 F.2d 688, 690 (1st Cir. 1992); Balcom v. Lynn Ladder & Scaffolding Co., 806 F.2d 1127 (1st Cir. 1986).

-16-

begin to run until May 12, 1997, then the filing of her administrative claim on March 4, 1998, would be within (although barely within) the 300-day period.

Under federal law the accrual of an employment discrimination claim "commences when a plaintiff knows, or has reason to know, of the discriminatory act." Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 759 (1st Cir. 1994). A plaintiff could learn of a change in position without appreciating until a later date that it was a serious adverse action. See Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994). However, Melendez was told on February 14 that she was being replaced as accounting manager, a position she had held for a decade, and understood that this was a demotion; and she was given few details as to her new position which she contends itself was a signal that this was a make-work job. She herself says that the impact of this news was so substantial that it triggered an initial depression and caused her to take a long leave of absence.

It is thus very hard to see how Melendez could have been in doubt on February 14 that a serious adverse job action had been taken against her. As for its cause, she claims that Cancel's views were well known to her before the demotion, and that she had already complained of them to the company. In our

-17-

view, a jury could not reasonably conclude that the cause of action accrued after February 14. Muniz-Cabrero is quite distinguishable, the employee in that case having merely been told of a reorganization and a new reporting chain. 23 F.3d at 608-09.

The more difficult issue involves Melendez's alternative claim that the statute of limitations should be tolled on account of her asserted mental disability during a pertinent period. The limitations period invoked by Cutler-Hammer here is the period for filing an administrative claim which (as already indicated), began to run on February 14, 1997, and, absent tolling, expired on December 11, 1997. Melendez did not file her claim until March 4, 1998. Her argument is that from November 1997 onward she was so severely depressed that the filing period should be deemed tolled.

The 300-day period is effectively a short statute of limitations established by federal law and whether it is tolled or suspended is also a federal issue. The case law generally allows courts to suspend such statutes for equitable reasons. While the usual reasons involve concealment or misrepresentations by defendants, Kale v. Combined Ins. Co. of Am., 861 F.2d 746, 751-52 (1st Cir. 1988), there are two cases in this circuit that recognize that mental disability may be a

basis for tolling in extreme cases, <u>Nunnally</u> v. <u>MacCausland</u>, 996 F.2d 1, 5-6 (1st Cir. 1993); <u>Lopez</u> v. <u>Citibank</u>, 808 F.2d 905, 906-08 (1st Cir. 1987).

Both cases, <u>Lopez</u> and <u>Nunally</u>, said that equitable tolling was available in principle but only if the plaintiff showed that the mental disability was so severe that the plaintiff was "[un]able to engage in rational thought and deliberate decision making sufficient to pursue [her] claim alone or through counsel."  996 F.2d at 5.  <u>Lopez</u> rejected the claim because the plaintiff had been represented by counsel, 808 F.2d at 907; <u>Nunnally</u> thought a hearing required where the plaintiff showed that she was "nearly a street person" with a probable diagnosis of paranoid schizophrenia, 996 F.2d at 6.

It is clear that merely to establish a diagnosis such as severe depression is not enough, <u>Lopez</u>, 808 F.2d at 907; but Melendez's evidence went considerably further.  In addition to contemporaneous and later expert diagnoses, she offered affidavit or deposition evidence from herself and her sister that from some period in November onward, her state was so impaired that she had to live with her sister and that for some of the time she was unable to manage even such basic functions as getting dressed and brushing her teeth.

-19-

Cutler points out that in mid January 1998, Melendez was interviewed by the state insurance fund to whom Cutler referred her when she sought to return to work. The interviewer's notes indicated that Melendez behaved in a "logical, coherent, relevant manner" and stated the facts "calmly, chronologically"; the narrative was apparently compelling enough for the interviewer to suggest that Melendez consult a lawyer, which she did not do until early February after her doctor arranged such an appointment for her.

Nevertheless, we agree with the district judge that Melendez raised a factual dispute about her capacity that could not be resolved solely on the papers. It is less clear whether even if Melendez was effectively disabled for part of the period, this was so for a period long enough to avoid the statute. This may depend not only on how long she was so disabled (if she was) but also on what rule is applied if she was disabled but only for a period that is less than the full delay in filing--here, 83 days over the 300 days allowed.

For example, it might be thought that once she put her case in the hands of her lawyer, her disability effectively ended. Lopez, 808 F.2d at 907. The lawyer, in turn, might argue that he or she was entitled to a reasonable time to investigate, although that might not be long, given that

Melendez knew her version of events and the filing requirement is almost ministerial. None of these issues has been discussed by the parties, and we express no views upon them.

This brings us to Cutler-Hammer's alternative claim that even if summary judgment was properly denied it, the factual dispute as to Melendez's disability should be resolved on the basis of an evidentiary hearing and the equitable tolling issue determined by the judge prior to trial. Cf. Rivera-Gomez v. de Castro, 900 F.2d 1, 2-3 (1st Cir. 1990). If equitable tolling is not established, no trial on the merits would be necessary; and given the high bar set by Lopez and Nunally, this is a distinctly possible outcome.

Where questions of fact are presented, statute of limitations defenses are ordinarily submitted to the jury, Fowler v. Land Mgmt. Group, Inc., 978 F.2d 158, 162 (4th Cir. 1992), but here the statute has unquestionably run unless equitable relief is afforded by the court. Further, typical statute of limitations questions--when the injury occurred, when the reasonable plaintiff would have learned of it, whether there was concealment by the defendant--are archetypal factual issues fit for jury resolution and, in addition, are ordinarily closely intertwined with merits issues of "what happened here."

The mental disability issue presented in the present case is of quite a different character. It relates not to Melendez's treatment as an employee and Cutler-Hammer's motivation but primarily to a plaintiff's later reaction to her mother's illness, to her behavior in the winter of 1997, and to medical testimony pertaining to her behavior during that period. Cf. Ott v. Midland Ross Corp., 600 F.2d 24, 31 (6th Cir. 1979). There are some possible connections to merits issues, but they are relatively slender.

A further consideration is that resolution of the equitable tolling issue rests only in part on medical facts; the judgment also turns on an understanding of what is involved in getting access to a lawyer and conveying to the lawyer information necessary to support a claim. These are matters calling for assessments that a judge may be far better able to make than a jury. They resemble in some measure the question, left to the judge, whether a criminal defendant is capable of assisting in his own defense. 18 U.S.C § 4244; United States v. Collins, 525 F.2d 213, 214 (1st Cir. 1975).

Under the precedents, the question whether equitable tolling is for the judge or jury is far from clear, and cases

can be found on both sides.[2]  Our own precedent leans in the direction of resolution by the judge, <u>Rivera-Gomez</u>, 900 F.2d at 2; <u>Earnhardt</u> v. <u>Puerto Rico</u>, 691 F.2d 69, 73 (1st Cir. 1982), and that course seems to us the wiser and more efficient outcome in this case.  Accordingly, we think on remand the judge should hold whatever hearing may be called for and decide the ultimate question whether equitable tolling is appropriate.

The judgment of the district court is <u>vacated</u> and the matter <u>remanded</u> to the district court for further proceedings consistent with this opinion.

---

[2]<u>Compare</u> <u>Ott</u>, 600 F.2d at 31, and <u>Vasconcellos</u> v. <u>EG & G, Inc.</u>, 131 F.R.D. 371, 372-73 (D. Mass. 1990), <u>with</u> <u>Smith-Haynie</u> v. <u>District of Columbia</u>, 155 F.3d 575, 578 (D.C. Cir. 1998), <u>and</u> <u>Rivera-Gomez</u>, 900 F.2d at 2-3.