**Marylou RICCI, Plaintiff,**

v.

**APPLEBEE'S NORTHEAST, INC., Defendant.**

**No. CIV. 03–28–B–W.**

United States District Court,
D. Maine.

Dec. 22, 2003.

---

Charles E. Gilbert, III, Gilbert & Greif, P.A., Bangor, ME, for Plaintiff.

Amy M. Fowler, Blackwell, Sanders, Peper, Martin, Paul F. Pautler, Jr., Blackwell, Sanders, Peper, Martin, Kansas City, MO, Richard G. Moon, Moon, Moss, McGill, & Shapiro, P.A., Matthew Tarasevich, Moon, Moss, McGill, Hayes & Shapiro, P.A., Portland, ME, Megan M. Belcher, Blackwell, Sanders, Peper, Martin, Kansas City, MO, Melinda J. Caterine, Moon, Moss, McGill, Hayes & Shapiro, P.A., Portland, ME, for Defendant.

### ORDER

WOODCOCK, District Judge.

There are three motions currently pending before the court: a Motion for Summary Judgment filed by Defendant Apple-

bee's Northeast, Inc. and two Motions to Strike, each filed by Plaintiff Ricci against Applebee's statements of material fact. Ms. Ricci initiated the pending action in state court, alleging age related discrimination in violation of the Maine Human Rights Act. 5 M.R.S.A. §§ 4551–4555 (West 2003). Applebee's removed the case to this court on the basis of its diversity jurisdiction. 28 U.S.C. §§ 1441, 1446 (West 2003).

■ Ms. Ricci has asserted a claim only under the Maine Human Rights Act. She was thirty-seven years old when hired and thirty-nine at the end of her employment. The age discrimination provisions of federal law do not apply to her. 29 U.S.C. § 631 (West 2003) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."). Maine law is not so restricted. *Maine Human Rights Comm. v. Kennebec Water Power Co.*, 468 A.2d 307, 309 (Me.1983) ("Unlike the federal act, the Maine statute does not specifically limit its protection to a particular age group; it is age–neutral").

## I. Motion for Summary Judgment.

### A. Standard for Review.

The moving party is entitled to a summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The trial court is obligated to "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). This court has stated, however, that in discrimination actions, "caution is appropriate when considering summary judgment for an employer." *Bilodeau v. Mega Indus.*, 50 F.Supp.2d 27, 46 (D.Me.1999).

### B. Background.

Consistent with the "conventional summary judgment praxis," this court recounts the facts in a light most favorable to Ms. Ricci's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv. Inc.*, 283 F.3d 11, 16 (1st Cir. 2002). The court has relied upon the uncontested facts or on Ms. Ricci's version, if in conflict.

Ms. Ricci was born on May 16, 1961. On June 17, 1998, when she was thirty-seven years old, she was hired as a hostess by Applebee's, a Bangor, Maine restaurant. At the time of her initial hiring, Kent McLaughlin was the General Manager of the Bangor Applebee's. Applebee's terminated Mr. McLaughlin's employment in May, 1999 and Kyle Russell, who had previously been Assistant Manager, assumed the position of General Manager. From May, 1999 through Ms. Ricci's termination on February 16, 2001, the management of the Bangor Applebee's consisted of Mr. Russell, Jean Girard, Assistant General Manager, Scott Wade, Assistant Manager, Nancy Millett, Assistant Manager, and Phil Kirber, Assistant Manager. Each manager's exact age is not a matter of record; however, as of January 2001, Mr. Russell was approximately thirty years old, Ms. Girard was about forty-three, Mr. Wade was thirty-four, and Mr. Kirber was in his mid-twenties. Ms. Millett's age does not appear in the record before the court.

Before Mr. Russell began as General Manager, Ms. Ricci enjoyed her work at Applebee's. She had asked Mr. McLaughlin for cross-training as a server and in January, 1999, began working as a server. After Mr. Russell assumed his position however, he made disparaging remarks about older employees. He said to Ms. Ricci that at least he had his own teeth,

knowing that Ms. Ricci had dentures. He commented that if he put Ms. Ricci's age and Beth Staples' age together, the number exceeded the ages of the remaining people working that night. He asked Ms. Ricci if she knew any "vibrant young females" who wanted to work at the bar. When Ms. Ricci forgot to bring a salad to a table, Mr. Russell commented: "That's the first thing that goes is your memory." He told Rachel Greene, a woman in her mid-fifties, not to bend over, because he was afraid she would not be able to get back up. When Ms. Greene forgot to enter something into the computer, he responded that it was understandable because of her age. He commented that Ms. Greene must be nearly as old as "Methuselah."

In addition to Mr. Russell's comments, Mr. Wade also made disparaging age related comments. Mr. Wade started calling Ms. Ricci "Pepe LePew" in reference to a streak of white or gray in her hair. When she fell and was injured, Mr. Wade told her the reason she was not healing was she had had children, was older, and was overweight and, therefore, it would take her longer to heal. Both Mr. Russell and Mr. Wade commented that the older workers were overweight and could not move as fast as the younger ones.

Mr. Russell showed favoritism to younger employees. Despite Ms. Ricci's interest in a bartending position, those positions were consistently given to younger, more attractive employees. Applebee's hired three younger women as bartenders, Ms. Cronin, who was in her early twenties, Ms. Jones, also in her early twenties, and Ms. Bartlett, who was in her early thirties. It refused to hire Diane King (formerly Goetz) as a bartender, despite the fact Ms. King had seven years of bartending experience. Ms. King was in her early fifties.

When Ms. Ricci expressed an interest in management, Mr. Russell ignored her, kind of chuckled, and told her "it didn't work that way." Instead, while Mr. Russell was General Manager, Applebee's promoted Phil Kirber, who was in his mid-twenties, and Scott Wade, who was in his early thirties, into management positions. Ms. Girard told her that as long as Mr. Russell was around, Ms. Ricci would go nowhere. During Mr. Russell's tenure, several older employees had their hours cut back to the point where they quit; they were replaced by younger workers. Mr. Russell stated that if he had his way, he would hire only young college girls. Mr. Russell was more lenient with young females, both in scheduling and mistakes

Mr. Russell's hiring of younger, more attractive employees was consistent with the wishes of regional management. Applebee's Regional Director, Bob Harrington, had told Kent McLaughlin that the older servers, MaryLou Ricci, Rachael Greene, Maria Irvine, and Beth Staples, did not fit the image Applebee's wished to project. He told Mr. McLaughlin that the Bangor staff was on the older side and overweight and wanted to know, "What are they doing here." He expressed concern that Applebee's would be required to purchase more extra-large size uniforms. Mr. Harrington also asserted the right to approve the hiring of all bartenders and it was Mr. McLaughlin's understanding that Mr. Harrington wanted younger, attractive females to attract young men to the bar.

Until late December, 2000, Ms. Ricci was frequently scheduled as a "closer" on her evening shifts. The closer has additional responsibilities, making certain that the restaurant is properly shut down and cleaned and that the servers had completed their side work. By late December, 2000, Ms. Ricci was infrequently scheduled as a closer and other employees were trained to perform this task.

Ms. Ricci first complained about Applebee's age discrimination to Ms. Girard. Ms. Girard responded that her hands were tied and there was not much she could do, but she would speak to Mr. Russell. When Applebee's opened a new restaurant in Waterville, Maine and Ms. Ricci volunteered to work at the opening, Ms. Ricci complained to Nancy Millett, an Applebee's manager, that the employees who were selected to work at the opening of the Waterville Applebee's were all younger. Ms. Ricci further complained to Phil Kirber, Scott Wade, and Bob Harrington that she thought Kyle Russell was discriminating against her because of her age. On July 24, 2000, Ms. Ricci called Applebee's Massachusetts corporate office and complained that older people were not being given the opportunity to apply for available positions, including bartending and management positions. She was assured that it would be taken care of. In January, 2001, she contacted Mr. Harrington at the Massachusetts office and complained about Mr. Russell's favoritism of younger workers; he responded by offering to write a job reference for her.

Beginning January, 2001, Ms. Ricci claims her hours were cut from approximately thirty hours per week to eight to ten hours per week. She continued to work at Applebee's from January 1, 2001 to February 16, 2001, when she was terminated. Her last work day at Applebee's was February 13, 2001. During the year 1999, Ms. Ricci earned a total in wages and tips of $11,821.00 or a weekly average of $227.32. During the year 2000, she earned a total in wages and tips of $12,379.70 or a weekly average of $238.07. During the six week period from January 1, 2001 through February 13, 2001, Ms. Ricci earned a total in wages and tips of $1,523.64 or a weekly average of $253.94.

In late January, 2001, Ms. Ricci called Applebee's regional office to complain about age discrimination. On February 12, 2001, Applebee's Regional Director Bob Harrington traveled from the area office to Bangor and met with Ms. Ricci. They met only briefly at Applebee's on February 12, 2001 and agreed to meet the next day at 10:00 a.m. to discuss the matter further and talk about resolution. Ms. Ricci had forgotten, however, that she had a doctor's appointment. She asked Mr. Harrington to wait for approximately one hour so that their meeting could go forward. Mr. Harrington was unable to wait and the meeting did not take place.

Ms. Ricci had begun to seek other employment. In January, 2001, she pursued employment at a restaurant called The Chocolate Grille that was about to open in the Bangor area. The Chocolate Grille was owned by two former Applebee's employees. In late January, 2001, she submitted an application for employment to The Chocolate Grille. Ms. Ricci was scheduled to work at Applebee's on February 13, 2001 and she did so. She was not scheduled to work on February 14, 2001, but was scheduled to work on February 15, 2001. Ms. Ricci was a "no call, no show" for her shift at Applebee's on the evening of February 15, 2001. As it turned out, Ms. Ricci had begun employment at The Chocolate Grill the evening of February 15, 2001. On February 16, 2001, Ms. Ricci returned to Applebee's and turned in her uniform and other materials. She made it clear to Ms. Girard that she was quitting her job at Applebee's. Shortly after her last day of work at Applebee's, Ms. Ricci contacted Carin Stutz at Applebee's corporate office and asked to return to work; Applebee's did not rehire her.

C. Discussion.

◼ Since both the Maine Human Rights Act (MRHA) and the Age Discrimi-

nation in Employment Act (ADEA) have the same general purpose and Maine courts have consistently looked to federal law in interpreting state antidiscrimination statutes, the court will not limit its review to Maine case law. Federal antidiscrimination law is useful in interpreting the proper application of the MHRA. *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 14 (1st Cir.1997); *French v. Bath Iron Works Corp.*, 45 F.Supp.2d 69, 72–73 (D.Me.1999); *Bowen v. Dep't of Human Serv.*, 606 A.2d 1051, 1053 (Me.1992)("the use of federal precedent as an aid in interpreting Maine's anti-discrimination provisions is appropriate."); *Plourde v. Scott Paper Co.*, 552 A.2d 1257, 1261–62 (Me.1989); *Percy v. Allen*, 449 A.2d 337, 342 (Me.1982).

■ In order to prevail on a federal claim of age discrimination, the Plaintiff must show "that she suffered an adverse job action, that this was motivated by age, and that she suffered an injury as a result of it." *Melendez–Arroyo v. Cutler–Hammer de P.R. Co.*, 273 F.3d 30, 33 (1st Cir.2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The First Circuit has handed down a series of decisions that illuminate the legal framework under which a plaintiff in a disparate treatment case may proceed. *See, e.g., Melendez–Arroyo, supra; Reed v. MBNA Mktg. Sys.*, 333 F.3d 27 (1st Cir.2003); *Vesprini v. Shaw Contract Flooring Servs.*, 315 F.3d 37 (1st Cir.2002); *Zapata–Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40 (1st Cir.2002); *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57 (1st Cir. 2000); *Mesnick v. General Elec. Co.*, 950 F.2d 816 (1st Cir.1991). In analyzing a claim that the plaintiff has failed to meet the prima facie showing of discrimination, the courts have reiterated that the burden of making out a prima facie case is "not onerous." *Texas Dep't of Community Af-fairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Rivera–Aponte v. Restaurant Metropol # 3, Inc.*, 338 F.3d 9, 11 (1st Cir.2003)("not burdensome"); *Zapata–Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir. 2002)("low standard of showing prima facie case"); *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.1991)("quite easy to meet"), *cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

The plaintiff may proceed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) approach, also known as the "pretext" approach. Under the pretext approach, the plaintiff must make a prima facie case of age discrimination, satisfying the three elements articulated in *Melendez–Arroyo*. Once a prima facie case has been established, the employee can force the employer to "explain its purported reason for its refusal to hire the plaintiff." *Melendez–Arroyo*, 273 F.3d at 33. The burden of production then shifts to the employer to offer an explanation or suffer a presumption of discrimination. If the employer offers a non-discriminatory explanation, the presumption disappears and the employee is required to show that the explanation is a "mere pretext for discrimination." *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. 1817; *Melendez–Arroyo*, 273 F.3d at 33. Under the pretext approach, the burden of proof remains on the plaintiff throughout the case. *Febres*, 214 F.3d at 60.

The plaintiff is not, however, limited to the pretext approach. Recognizing that in some cases, there is evidence a proscribed factor played a motivating part in a disputed employment decision, the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268, (1989), set forth an alternative means by which the plaintiff could proceed. Under

the *Price Waterhouse* approach, also called the "mixed motive" approach, once the plaintiff demonstrates that both "legitimate and illegitimate reasons motivated the decision," the employer could "avoid a finding of liability ... by proving that it would have reached the same decision regarding the plaintiff even if it had not allowed the proscribed factor to play such a role." *Price Waterhouse*, 490 U.S. at 244, 109 S.Ct. 1775. In *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 2154, 156 L.Ed.2d 84 (2003), the United States Supreme Court, responding to the enactment of the Civil Rights Act of 1991, clarified *Price Waterhouse* by holding that "no heightened showing is required under section 2000e–2(m)" of title 42. The plaintiff may use both direct and circumstantial evidence and there is no "special evidentiary burden." *Id.*, 539 U.S. at —— – ——, 123 S.Ct. at 2153–54. The *Desert Palace* Court was explicit in its holding:

> In order to obtain an instruction under section 2000e–2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."

*Id.* at 2155. The *Desert Palace* Court was addressing an amendment to the Civil Rights Act and its holding noticeably omits age as a proscribed factor. However, the First Circuit has applied *Desert Palace* to claims made under the ADEA. *Estades–Negroni v. The Assoc. Corp. of N. Am.*, 345 F.3d 25, 30 (1st Cir.2003).

It is unclear whether Ms. Ricci is attempting to take advantage of the "mixed motive" burden shifting mechanism. In her opposition memorandum, she fails to mention the mixed motive approach, to cite any mixed motive cases, or to engage in a mixed motive analysis. By contrast, she has made an emphatic and direct argument on the pretext approach.

### 1. Adverse Tangible Employment Action.

Applebee's strenuously denies it ever took an "adverse tangible employment action" against Ms. Ricci. In *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), Justice Kennedy defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." The *Ellerth* court went on to cite illustrative case law:

> Compare *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), with *Flaherty v. Gas Research Institute*, 31 F.3d 451, 456 (7th Cir.1994)(a "bruised ego" is not enough); *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 887 (6th Cir.1996)(demotion without change in pay, benefits, duties, or prestige insufficient) and *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994)("reassignment to more inconvenient job insufficient").

*Id.* at 761, 118 S.Ct. 2257.

In her memorandum, Ms. Ricci has identified the following adverse employment actions: "age-based harassment by Kyle Russell and Scott Wade, the denial of promotions, the loss of closing shifts, and a reduction in her hours from an average of 30 hours per week to only 8 to 10 hours

per week." *Pl.'s Memorandum* at 7. Applebee's argues that Ms. Ricci was in fact never denied a promotion to bartender, because the bartender position was not a promotion and furthermore, she never applied for the position. It contends she was never denied a promotion to management, because there is no evidence she was either interested in a management position or qualified for it. It denies that the closer position represented a material change in the nature of her employment. It explains the reduction of hours by its perception that Ms. Ricci was looking for other employment, a perception that turned out to be true. Noting that Ms. Ricci quit employment at Applebee's, it argues that Ms. Ricci has not met the high evidentiary burden of demonstrating she was constructively discharged.

### a. The Bartending Job.

The record contains the following facts on the bartending position: In either late 1998 or early 1999, Bob Harrington, Applebee's Regional Director, issued a memo indicating that, unlike the server positions, Mr. Harrington himself would have to approve the hiring of all bartenders. Following the issuance of this memo, Mr. Harrington explained to Mr. Russell, then the General Manager of the Bangor Applebee's, the reason for this requirement was that Applebee's preferred young female employees in bartending positions to attract young men to the bar to spend money. Consistent with this policy, despite applications for bartending positions from older women, at least one of whom had prior bartending experience, Applebee's hired three younger attractive women, two in their early twenties and one thirty years old, to fill the bartending positions.

Ms. Ricci called Applebee's Massachusetts corporate office on July 24, 2000 and complained about its age discrimination, specifically mentioning bartending positions. In September 2000, Mr. Russell announced to the entire group of employees that Applebee's was going to cross-train two bartenders. Despite her earlier complaint, Ms. Ricci did not indicate any interest in cross-training for the bartending position at that time, because one of her co-workers had expressed an interest in working as a bartender and had asked her not to apply for it. As a result of the September, 2000 announcement, two unidentified employees were cross-trained as bartenders. Contrary to Applebee's memorandum, there is evidence that the bartenders were paid $4.00 per hour and the servers were paid $2.13 per hour. *Pl.'s Statement of Material Fact (SMF)* at 146.

In either September or October, 2000, Ms. Ricci expressed an interest in cross-training for the bartending position when she learned that "Christine," another Applebee's employee, was leaving Applebee's and returning to Maryland in December. She told Scott Wade, the Assistant Manager, that if they were filling that position, she would like to be considered for it. In response to Ms. Ricci's statement of material fact on this issue, Applebee's has made a qualified admission. Applebee's referred to Ms. Ricci's testimony on the bartending position and stated the following: "Paragraph 115 implies that 'Christine's' bartending position was vacated in September or October, 2000. The testimony indicates that it was not due to be vacated until December, 2000, *and there is no evidence in the record that the position was actually ever vacated*." *Def.'s Response to Pl.'s Additional Facts* at 115.

 Applebee's has focused on a gap before the court: the absence of any evidence that Ms. Ricci applied and was rejected for an open bartending position. Citing *Breland–Starling v. Disney Publishing Worldwide*, 166 F.Supp.2d 826, 830

(D.C.N.Y.2001), Applebee's makes a *Burdine* argument. In *Burdine*, the United States Supreme Court held that in order to establish a prima facie case of age discrimination, a plaintiff must show "she applied for an available position for which she was qualified, but was rejected under circumstances which gave rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. The requirement of an application for an available position has been read as mandating more than a generally expressed interest in promotion:

> "We read McDonnell Douglas and Burdine generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion. This general mandate ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer. Moreover, we believe if generally requesting a promotion in an annual review were sufficient to establish a prima facie case, employers would be unfairly burdened in their promotion efforts. Rather than simply considering individuals who have specifically applied for a promotion, an employer would additionally have to keep track of all employees who have generally expressed an interest in promotion and consider each of them for any opening for which they are qualified but did not specifically apply."

*Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2nd Cir.1998); *Breland–Starling v. Disney Publishing Worldwide*, 166 F.Supp.2d 826, 830 (D.C.N.Y.2001).

Although Ms. Ricci states she complained to Applebee's in the summer of 2000 about age discrimination in the hiring of bartenders, there is no evidence she had at that point identified a specific open bartending position for which she had applied and been rejected. When the opportunity arose to apply for one of the bartending spots in September, 2000, she declined to do so. The court, therefore, focuses on what the record reveals after the September, 2000 all-staff meeting to determine whether the Plaintiff has met the *Burdine* requirement.

Viewing the entire record in a light most favorable to the Plaintiff, Ms. Ricci has produced the following evidence: the existence of a potentially effective, if improper, corporate policy of discriminating against older workers in favor of younger attractive women to encourage the patronage of younger, drinking age men, the actual hiring of three younger woman bartenders during her period of employment, the higher hourly wage for bartenders, her general expression of interest both before and after September, her specific expression of interest in the bartending job held by Christine, and the undisputed fact that she was never cross-trained as a bartender.

Applebee's is correct; there is what appears to be a gap in the Statements of Material Fact, a gap potentially fatal under *Burdine*. However, Applebee's itself has filled the gap. In its Memorandum, Applebee's stated as follows: "For a complete statement of facts as to which there is no genuine dispute, Applebee's refers the Court to Defendant's Statement of Uncontroverted Material Facts ('SOF') *and Exhibits filed contemporaneously*." *Def.'s Memorandum* at 1. Among Applebee's exhibits is a transcript of the testimony of Kyle Russell, and, contrary to Applebee's contention, in his testimony, Mr. Russell not only admitted Christine had left employment, but also confirmed Ms. Ricci had complained to him about not being

allowed to cross-train into Christine's bartending position. *Russell Dep.* at 76–77, 81–82 & 115.

In light of Mr. Russell's testimony to the contrary, Applebee's argument that "there is no evidence in the record that the position was actually ever vacated" is troublesome. Whether and when Applebee's employees have left its employment are facts not ordinarily matters of serious dispute and presumably within Applebee's own knowledge. When it made this argument to the court, Applebee's certainly knew both that Christine had left its employ and when she had left. Applebee's also knew that Mr. Russell had testified she had done so and that he had admitted Ms. Ricci had later complained to him she had not been cross-trained into Christine's bartending position. The court will not do as Applebee's urges: base a dispositive decision on the plaintiff's failure to include a demonstrable material fact in her Statement of Material Facts that is otherwise a matter of record.

■ The court is cognizant of Local Rule 56 and the manifest need for the parties to comply scrupulously with its requirements. The court has no independent duty to search or consider any part of the record not specifically referenced in the parties' statements of material fact. *Local Rule* 56(d). By making this decision, the court neither encourages nor condones the failure of the parties, particularly in this case the plaintiff, to isolate in Statements of Material Fact the salient facts with record citation as required by the Rule. *Local Rule* 56. Local Rule 56 was designed to halt the former summary judgment practice of submitting a voluminous record and leaving to the court the duty to comb the record in search of material facts. But, the court, having discovered record evidence of the plaintiff's omission, is unwilling to unring the bell. The record contains clear evidence that Applebee's argues it does not. In these circumstances, to enforce the strict provisions of Local Rule 56 would result in an injustice this court cannot countenance. Therefore, under Local Rule 1(a), the court will consider Mr. Russell's testimony on this point in evaluating the motion for summary judgment.

■ In view of Mr. Russell's testimony, the additional critical facts include that after Ms. Ricci expressed an interest in cross-training in Christine's position as a bartender, Christine left her position, that Ms. Ricci was not cross-trained to replace Christine, and that Ms. Ricci complained to Mr. Russell that she had not been so cross-trained.[1] With these additional facts, there is evidence in the record, which when viewed in a light most favorable to the plaintiff, to withstand Applebee's motion for summary judgment on the bartending job.

**b. The Management Position.**

■ Ms. Ricci has also claimed she was denied promotion into a management posi-

1. This recitation casts the evidence in a light most favorable to Ms. Ricci as the court at this stage is required to do. Ms. Ricci testified that, after the all-staff meeting of September/October, she learned that Christine was going to leave the bartending job in December. *Ricci Dep.* at 189–90. Mr. Russell testified that Christine's position was one of the two positions to be vacated in the fall of 2000 and her position was one of the two positions made available at the staff-wide meeting in September/October, 2000. *Russell Dep.* at 76–77. If Mr. Russell is correct, then Ms. Ricci did not indicate an interest in Christine's position, since it was the two bartender positions that were the subject of the all-staff meeting Ms. Ricci acknowledged she had not applied for. Regardless of the version, however, Applebee's contention that there is no evidence Christine ever left Applebee's is flatly contradicted by Mr. Russell's own testimony. *Russell Dep.* at 77–78, 81–82, & 115.

tion, based on her age. Applebee's contends that the record contains sparse evidence from which this conclusion can be rationally drawn. It asserts that Ms. Ricci never applied for a management position and further that there is no evidence she was qualified to fill such a position. In response, Ms. Ricci states that in response to a poster about referring people for management positions, she had gone to Kyle Russell and inquired if she could refer herself. He "ignored her, kind of chuckled, and told her it didn't work that way." She then went to other managers, Nancy Millett and Jean Girard, and asked about whether she could refer herself to a management position. Ms. Girard responded that so long as Mr. Russell was there, she would never "go anywhere."

In the court's view, the evidence Ms. Ricci has produced withstands Applebee's motion for summary judgment on this issue. The record contains evidence that Applebee's did not have a practice of formally posting management positions. When Ms. Ricci inquired of Mr. Russell, his dismissive reaction could be placed in the context of his other statements replete with derogatory age-related comments. Stymied by Mr. Russell, when Ms. Ricci went to her other supervisors to inquire about a management job, she was informed essentially that so long as Mr. Russell was the General Manager, she would not be considered for a management position. It is a reasonable inference, based on this record, that Mr. Russell's dismissive reaction was motivated by his age based biases.

█ It is true that a general inquiry does not constitute an application for "a particular position for which she was qualified," *Breland–Starling,* 166 F.Supp.2d at 830, "under circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

However, it is also true that in *Suarez v. Pueblo Int'l,* 229 F.3d 49, 54 (1st Cir.2000), the court noted that "an employer cannot accomplish by indirection what the law prohibits it from doing directly." Ms. Ricci is in effect claiming that Applebee's, through its procedures and management, prevented her from applying for a management position. Taking this factual predicate as true for purposes of this motion, Applebee's is in no position to claim that its success in doing so, bars her complaint.

Ms. Ricci's allegation is similar to the case of *Mauro v. S. New Eng. Telcomms., Inc.,* 208 F.3d 384 (2nd Cir.2000), a case decided after *Brown v. Coach Stores.* In *Mauro,* the employer never posted the positions in which the employee had expressed an interest and then claimed, as here, that the employee had never applied for the specific job at issue. The *Mauro* court declined to apply Brown:

> Although we held in *Brown* that a plaintiff alleging failure to promote ordinarily must show that he or she applied for the specific job or jobs at issue (citation omitted) that requirement does not apply where, as here, the plaintiff indicated to the employer an interest in being promoted to a particular class of positions, but was unaware of specific available positions because the employer never posted them. In such a situation, requiring the plaintiff to show that he or she applied for the specific jobs at issue would be unrealistic, as an employee by definition cannot apply for a job that he or she does not know exists.

*Mauro,* 208 F.3d at 387.

Coupled with the plaintiff's evidence of improper discriminatory motivation, *McMillan v. Mass. Soc'y for the Prev. of Cruelty to Animals,* 140 F.3d 288, 300 (1st Cir.1998), the Plaintiff has raised a jury question on her claim that she was denied

or prevented from applying for a management position, due to her age.

### c. The Job As Closer.

■ Ms. Ricci points to a change in duties sometime in December, 2000 whereby she was not scheduled to work as a closer at the end of a shift. The closer assumes the additional responsibility of making sure the restaurant is closed, cleaned properly for the next day's opening, and that the servers have done their side work. The parties have agreed, however, that the server designated as "closer" "does not receive any extra pay or any additional prestige over that of a server who is not designated as a 'closer.'" Against this agreement, however, Applebee's itself has pointed out that Ms. Ricci may have suffered a loss of income as a consequence of this change of schedule. In its Reply Memorandum, Applebee's states: "Training other servers as 'closers' may have consequently reduced the Plaintiff's hours very minimally because when she was not a closer she did not have to stay until the very end of a shift if business was slow." *Def.'s Reply* at 6, n. 10.

Applebee's argues that this change of duties was not sufficient as a matter of law to constitute a materially adverse change in a term or condition of employment. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 55 (1st Cir.2000)("The bottom line is simply this: reduction in responsibility or a change in the way that business is done, unaccompanied by diminution of salary or some other marked lessening of the quality of working conditions, does not constitute a constructive discharge."); *Kocsis*, 97 F.3d at 885 ("reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."); *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987)(a temporary transfer that result-

ed in no pay or benefits reduction did not constitute an adverse employment action); *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 885 (7th Cir.1989)(changes in duties or working conditions that cause no materially significant disadvantage are not actionable).

The reduction in hours cited by Applebee's, however, is sufficient itself to constitute an "adverse employment action." In *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1243 (8th Cir.1998), the court noted that a denial of vacation days "easily qualifies as an adverse employment action because it was a material change in one of Coffman's existing employment benefits." The same is true of Applebee's refusal to allow her to continue to work as a closer with its slightly increased hours of employment.

### d. Cut Back In Hours.

■ In its motion for summary judgment, Applebee's initially assumed that Ms. Ricci was preceding under both hostile working environment and constructive discharge theories of liability. In her responsive memorandum, however, Ms. Ricci clarified her position: she "does not claim that she left her employment at Applebee's solely because of the hostile work environment." *Pl.'s Memorandum* at 10. Instead, Plaintiff asserts that she was "compelled to leave her job at Applebee's and find employment elsewhere because her hours were cut so drastically that she could no longer contribute to the financial support of her family." *Id.* at 10–11. Ms. Ricci contends that because Applebee's motivation in reducing her working hours was based both on her age and on her complaints of age discrimination, she has stated a constructive discharge claim that survives Defendant's Motion for Summary Judgment. In this sense, Ms. Ricci points to evidence of age related comments and

insinuations as evidence not of a hostile working environment, but rather of the employer's improper motive in reducing her hours and retaliating against her for her complaints.

The First Circuit has placed its imprimatur on the plaintiff's legal theory. As noted above, in *Suarez*, 229 F.3d at 54, the First Circuit stated that "an employer cannot accomplish by indirection what the law prohibits it from doing directly. Just as the ADEA bars an employer from dismissing an employee because of his age, so too it bars an employer from engaging in a calculated, age-inspired effort to force an employee to quit." The question is whether the evidence in the record, when analyzed in the light most flattering to the plaintiff's theory of the case, would allow a reasonable trier of fact to find that the employer constructively discharged her. *Id.*

The crux of Ms. Ricci's claims is after she complained to management in December, 2000 or January, 2002, her hours of work were drastically cut back. She asserts that her working hours were cut back as much as 60–70% and that this resulted in a corresponding loss of earnings of 60–70%. As the *Coffman* case pointed out, a significant cut back in her hours and wages alone would be sufficient to prove material adverse employment action. *Id.* at 1245.

The Plaintiff has asserted that she "had decided to start working at The Chocolate Grille because her hours at Applebee's had been cut to eight to ten hours a week and she could not contribute to her family's financial situation on that small amount of hours." *Pl.'s SMF* at 134. Against this statement is her admission that she actually earned $1,523.64 during the period from January 1, 2001 through February 13, 2001, more money per week than she had earned during the years 2000 and 1999.

The parties have elected not to provide the court with actual work logs or pay stubs and instead have chosen to argue about whether the best evidence rule has been violated by their absence.

Thus, the court is left with an odd record. The Plaintiff insists her hours were drastically cut; the Defendant demonstrates she had earned more year to date in 2001 than she had earned in previous years, if the 2001 earnings are annualized. Higher earnings with substantially fewer hours would not commonly be an employment condition a reasonable employee would consider adverse. Nevertheless, if Applebee's suddenly and dramatically cut her hours from thirty to only eight to ten hours, it would not take long for an employee to be forced to seek other employment. This is particularly true in Ms. Ricci's case, since her gross weekly earnings for the 2001 year to date equal $253.94. A reduction to 8 to 10 hours per week, if directly proportional to her wages, would have caused her to earn less than $90.00 per week, a reduction, which if found by a factfinder would be sufficient to sustain a constructive discharge claim.

It is true that the First Circuit has imposed a stringent standard of proof for claims of constructive discharge. In *Suarez*, the First Circuit noted the following:

> To take the measure of a claim of constructive discharge, an inquiring court must gauge whether the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign. *See Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir.1993). This standard cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held. *See id.* at 481; *Calhoun*, 798 F.2d at 561. The ultimate test is one of objective reason-

ableness. *See Serrano–Cruz v. DFI P.R., Inc.*, 109 F.3d 23, 26 (1st Cir.1997); *Vega*, 3 F.3d at 481. The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world. Thus, the constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics. *See Calhoun*, 798 F.2d at 561.

*Suarez*, 229 F.3d at 54. *See also Leavitt v. Wal–Mart*, 238 F.Supp.2d 313 (D.Me. 2003), *aff'd in part* and *rev'd in part on other grounds* 74 Fed.Appx. 66 (1st Cir. 2003); *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("Summary judgment on the constructive discharge claim was appropriate; the Plaintiffs did not allow sufficient time for Thompson and Brock to correct the situation."); *Coffman*, 141 F.3d at 1247 ("If an employee quits without giving her employer a reasonable chance to work out the problem, then she has not been constructively discharged").

Despite this high standard, viewing the evidence in a light most favorable to the plaintiff, Ms. Ricci has presented an evidentiary basis from which a reasonable factfinder could conclude that she had been constructively discharged. Ms. Ricci's statements about the cut-back in her hours must be accepted as true, and in the constructive discharge context, a cut from thirty to eight to ten hours per week is evidence of an employment action so severe that she "was compelled to resign rather than stay on the job while seeking redress." *Leavitt*, 238 F.Supp.2d at 316. She has also presented sufficient evidence of Applebee's improper motivation to create a jury question on whether the actions of Applebee's were improperly related to her age.

## 2. Legitimate Non–Discriminatory Reasons for Applebee's Business Decision.

■ Under *McDonnell Douglas*, the next step in the analysis is whether Applebee's has produced evidence of legitimate non-discriminatory reasons for its business decisions, thereby shifting the burden of proof back to Ms. Ricci. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Regarding both the closer and hour cutting issues, Applebee's has produced evidence it had a legitimate non-discriminatory reason for its decisions. It notes that Ms. Ricci ended up doing just what Applebee's feared she would do: "she failed to show up for a scheduled shift at Applebee's and began work at The Chocolate Grille without giving Applebee's any advance notice." *Def.'s Memorandum* at 15. Applebee's has met its burden of production on this issue by "articulating a legitimate non-discriminatory reason for the adverse employment decisions." *Mesnick*, 950 F.2d at 816; *Alvarez–Fonseca*, 152 F.3d at 24 ("the defendant need only produce an explanation"). It has not attempted to offer an explanation for its failure to post management positions or its failure to respond to Ms. Ricci's interest in cross-training for the bartending position.

## 3. Absence of Evidence of Pretext.

■ At this point, the burden shifts back to the plaintiff to demonstrate that "the defendant's explanation is false, and that the real reason behind the defendant's actions was discriminatory animus." *Alvarez–Fonseca*, 152 F.3d at 24–25. This final burden of proof is "unassisted by the original inference of discrimination." *Mesnick*, 950 F.2d at 823. Applebee's contends that there is insufficient evidence of pretext in

the record to withstand its motion for summary judgment. The court disagrees. It would be an exercise in redundancy to reiterate the evidence Ms. Ricci had produced in this case. Instead, it suffices to say that the evidence taken as a whole, if believed, would allow a reasonable factfinder to conclude that Applebee's acted with discriminatory animus against Ms. Ricci in its actions regarding the bartending position, the management position, the closer position, and its cutting of hours.

## CONCLUSION.

For the reasons set forth above, Applebee's motion for summary judgment must be and is **DENIED**.

## II. Motions to Strike.

Turning to Plaintiff's motions to strike, Plaintiff's first motion dated September 4, 2003 is to strike eight paragraphs of Defendant's Statement of Uncontroverted Material Facts on a variety of grounds. The court declines to rule on the motion, since it has not considered any of the offending paragraphs in arriving at its decision.

On September 23, 2003, Plaintiff moved to strike pages 1–3 of the Defendant's Reply Memorandum on the ground that the arguments in those pages, in Plaintiff's view, are legal argument and properly belong "in Defendant's reply memorandum or in a separate motion, but not in a reply statement of material facts." This Motion to Strike is **DENIED**.